Larry Deane MATTHEWS, Plaintiff,

v.

Kenneth JEFFERSON, in his Official Capacity as County Judge for Marion County, Arkansas, Defendant.

No. Civ. 97–3071.

United States District Court,
W.D. Arkansas,
Harrison Division.

Oct. 13, 1998.

Frederick Rick Spencer, Mountain Home, AR, Christopher R. Heil, Morgan Welch & Associates, Little Rock, AR, for Plaintiff.

Robert R. Russell, Duncan & Rainwater, Little Rock, AR, for Defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Senior District Judge.

This case is currently before the court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment on liability. Trial is scheduled for the week of November 16, 1998.

*Background.*

The plaintiff, Larry Deane Matthews (Matthews), is disabled in that he suffers from T-3 paraplegia, necessitating the use of a wheelchair and other mobility aids for ambulation. On March 18, 1996, Matthews was scheduled to appear in the Marion County Chancery Court. The chancery court is located in the Marion County Courthouse on the second floor. The courthouse is listed on the National Registry of Historic Buildings.

The courthouse does not have an elevator, ramp, or other device making the second floor accessible to anyone with disabilities involving mobility.[1] The public entrance doors to the courtroom are not wide enough for a wheelchair to pass through. *Matthews Deposition at* 21. Additionally, the restrooms on the second floor are not accessible to wheelchair bound individuals.

When Matthews arrived for the March 18th hearing, he had to be carried up the stairs to the courtroom by men Kenneth Jefferson, the County Judge, had arranged for, or located, to provide the needed assistance.[2] During the course of the hearing which lasted from approximately 9:00 a.m. until 7:00 p.m., Matthews alleges he was unable to empty an external catheter because of the inaccessible restrooms. As a result, Matthews states the catheter "backed up" causing a urinary tract infection and other

maladies of a related nature. Matthews was also unable to leave the second floor to obtain a meal during the noon recess.

At the end of the hearing, Matthews contends the only persons left in the courthouse were Ms. Patricia Toch, Matthews' attorney, and Ms. Mary Jo Layton, the court clerk, who were unable to carry him down the stairs. Judge Jefferson was no longer in the building and apparently no arrangements were made to carry Matthews down the stairs. Thus, Matthews states he was forced to remove himself from his wheelchair and with great difficulty make his way down the stairs.[3] *Matthews Deposition at* 28.

Matthews testified he had similar difficulties on two other occasions in May and June of 1996 when he was scheduled to appear before the Marion County Chancery Court. *Matthews Deposition at* 22–25 & 36. As was the case with the March hearing, court was held on the second floor of the courthouse and lasted from approximately 9:00 a.m. to 7:00 p.m. The morning of the second hearing, Matthews was told "[t]here was not enough room, no place else to have court." *Matthews Deposition at* 33.

After the second hearing, he was helped down the stairs by his brother, his cousin, and another gentleman, Jim Railey, who was there for the hearing. *Matthews Deposition at* 28–29. After the third hearing, Matthews started down on his own but his cousin did come and help him down. Although Matthews had difficulties when he had scheduled court appearances, he didn't believe anybody in the courthouse had any animosity toward him and believed Judge Jefferson and Ms. Layton were very concerned about the situation. *Matthews Deposition at* 28 & 34.

Marion County has set forth in some detail the steps it has taken in response to the requirements of Title II of the ADA. In February and May of 1992, Marion County

---

1. The Marion County Quorum Court also holds its meetings in the second floor courtroom. *Jefferson Deposition at* 26. Matthews was unable to attend the meetings because of this. *Matthews Deposition at* 56.

2. Plaintiff points out that the chancery court judge, Judge Gary Isbell, is also wheelchair-bound. To reach his courtroom, Judge Isbell is

apparently carried up the stairs at the courthouse.

3. Toch and Layton provided some assistance. Specifically, Matthews testified that "[t]hey kept me from just going down head first as I kinda slid down." *Matthews Deposition at* 30.

(hereinafter the County) first began assessment of the Americans with Disabilities Act (ADA) and its implementation in the County.

On August 3, 1992, the County Quorum Court enacted Resolution 92–5 mandating implementation of the ADA. On the same date, Judge Jefferson was appointed the ADA coordinator for the County. Jefferson's daughter is wheelchair bound due to paraplegia. In late 1994, Bill Jett became County ADA coordinator. In late 1996, Jett was replaced by Diane Fox.

The County says it evaluated each of its current services, policies, and practices to determine whether each met the requirements of the Title II regulations. It directed its key employees to identify barriers, including all physical facilities, as well as all current county services, policies, and practices that were not in compliance with the ADA for inclusion in the transition plan.

Interested persons were allowed to submit comments on the self-evaluation process. On August 13, 1992, the public was given notice for a point of contact to place requests, suggestions, and grievances concerning the ADA. The County also maintained for public inspection a list of interested persons consulted in the self-evaluation process, a description of areas examined and problems identified, and a description of modifications made.

The County developed a transition plan setting forth the physical modifications it deemed necessary to comply with the Title II implementing regulations. The transition plan placed priority on curb ramps or sidewalks providing access to public facilities and public accommodations and designated the public official who was responsible for its implementation.

On September 15, 1992, the Quorum Court met to discuss funding of the costs of improvements for ADA compliance. The general millage was raised from 1.8 mills to 4.0 mills. Out of this increase, the County set aside $25,000 per year to spend on ADA compliance. *Jefferson Deposition at* 6. Over

the years, expenditures from the ADA fund were made for general business and for various clean up items. *Id.* at 44–46. This was done through reauthorization of the funds for other use. *Id.* at 46.

In January and February of 1993, assessment meetings were held and architectural services were performed by Jeff Laur. In February of 1993, a wheelchair accessible telephone was installed in the courthouse. In November and December of 1993, the Quorum Court agreed elevators should be installed in the courthouse within the year.

To date, elevators have not been installed. The option of installing a chair-lift was not investigated because Judge Jefferson didn't believe it was appropriate. *Jefferson Deposition at* 21.[4] He based his opinion on the narrowness of the hallway and on his consideration of the dignity of the individual having to use the chair lift. *Id.*

On December 5, 1994, the Quorum Court agreed the courthouse maintenance fund would carryover $25,000 and have $25,000 added for 1994 which made a total of $50,000 available for the courthouse elevator. At some point in 1994, an estimate was obtained for installation of the elevator. The estimate came to $300,000. Of the $300,000, approximately $100,000 represented the cost of the elevator. The remaining cost was for the installation of fire exists made necessary by the installation of the elevator. *Jefferson Deposition at* 15, 31–32.

In January of 1995, none of the county buildings were in total compliance with Title II. *Jefferson Deposition at* 35. On April 3, 1995, Resolution 95–4 was adopted which used "Ice Tea" (Internal Service Transportation Efficiency Act) federal funding to restore the courthouse. These funds were not used for ADA compliance.

On June 5, 1995, Ordinance 95–11 was enacted providing for the restoration and improvement of the courthouse. At this time, there was still not enough funding set aside for the elevator and other improvements. To obtain the needed funding, Ordi-

---

**4.** Plaintiff offers the affidavit of David Jones, a licensed architect, which indicates the high and estimated cost of a chair-lift installation in the

Marion County Courthouse would be $35,000 to $50,000. *Jones Affidavit* at ¶ 4–5.

nance 95–11 provided for a 1% sales tax for an 18 month period.

On September 11, 1995, the Quorum Court announced the voters had rejected the sales tax increase. Alternate ways to generate the needed funds were discussed as was the possibility of obtaining a new building for a courthouse. The Budget and Finance Committee was asked to look into the courthouse needs.

In December of 1995, the Quorum Court announced that the auditor required the ADA money to be taken out of the courthouse maintenance fund and put in its own line item because other taxing units should not have to pay for the courthouse maintenance. Later in December, the 1996 budget which included a line item for courthouse ADA improvements was approved.

On January 2, 1996, Quorum Court members were provided with a package containing a general plan for compliance. *Defendant's Exhibit A.*[5] Shortly thereafter, the County listed everything it needed to renovate to be in compliance and adopted Resolution 96–3 which included as a goal: "ADA: Begin compliance in 1996."

On April 5, 1996, the Quorum Court set ADA compliance as a goal for 1996. On May 6, 1996, the Quorum Court Building Committee approved the purchase of the old Arkansas Power & Light (AP & L) building that is adjacent to the courthouse, subject to environmental review, with a view toward making it an accessible facility for courtrooms and related offices. On June 3, 1996, the building committee adopted Resolution 96–5 accepting the terms of the purchase of the AP & L building. Also in June, Jeff Laur presented the County with a proposal, which included ADA compliance, to remodel the AP & L building and convert it to a new courthouse and office building.

In December of 1996, the Quorum Court approved the purchase of the building. In January of 1997, ADA funds were placed into a special account for better tracking. In February of 1997, the ADA coordinator presented a new plan for compliance and a transition plan.

Until the AP & L building, known as the courthouse annex, is completed, the County states it will accommodate disabled citizens through other arrangements such as holding court in a more accessible area if the disabled citizen will notify the clerk prior to the meeting or court hearing. The County represents the annex should be open and accessible on August 1, 1998.[6]

In February of 1997, the County entered into a contract for ADA improvements to the courthouse. In July of 1997, the Quorum Court requested a sales tax election to raise money to complete the ADA specifications. The sales tax failed in the November election.

The County admits that the second floor of its courthouse was not accessible to individuals with disabilities involving mobility on March 18, 1996, when Matthews was scheduled to appear before the chancery court. Although the first floor of the courthouse is wheelchair accessible, there is really no place on the first floor to hold court. *Jefferson Deposition at* 67. In the past, the court is informed the County has used the AP & L building and the Yellville City Hall for court meetings to accommodate disabled individuals. *Id.*

In this case, the County states Matthews did not make the sitting judge aware of his disability prior to the hearings, nor did he at any point during the hearings inform the judge that he had problems attending court. However, Matthews testified that the judge

---

5. Exhibit A contains a cover sheet which states: "Marion County Plan for Compliance with the Americans with Disabilities Act." However, the attached pages are merely a model plan for compliance and contain very little specific information regarding the County's needs and plans. The cover letter dated January 2, 1996, directed to County Quorum Court members indicates counties should have been in compliance by 1993 but that deficiencies remained.

6. We note that the County's summary judgment motion was filed on September 2, 1998, and refers to an expected completion date of August 1, 1998. As that date had passed prior to the filing of the motion, the court assumes that the annex, for whatever reason, had not yet been opened to the public. In its response to the plaintiff's cross-motion, the County represents the courthouse annex is now complete.

was "very much aware" of the problems he was having accessing the courtroom. *Matthews Deposition* at 37. He also testified that his attorney and his wife during the first hearing asked whether the hearing could be held someplace else and were told "[t]here wasn't enough room to have it anyplace else." *Id.*

██ The County asserts that it would have made a reasonable accommodation for plaintiff if he had contacted courthouse personnel prior to his court appearance to make alternative plans or if he had asked that the hearing be relocated. When court recessed on March 18, 1996, the County also asserts that the court personnel offered to seek help to carry plaintiff down the stairs but he insisted he exit the second floor by himself. After he started down the stairs, the County states his cousin, Doug, came and assisted the plaintiff.[7] The County also points out that Matthews never filed a grievance with the County before filing this lawsuit and never asked to speak to the County ADA coordinator.[8] The County states that on a prior occasion Judge Bearden made an accommodation for plaintiff by going downstairs to have a personal hearing in plaintiff's court matter so plaintiff would not have to attempt to go upstairs.

Plaintiff contends that the courthouse and other facilities owned by Marion County do not comply with the regulations promulgated under the Americans with Disabilities Act or Section 504 of the Rehabilitation Act. He contends there is no reasonable accessibility to the chancery court by those persons requiring wheelchairs or other mobility assistance due to disabilities or handicaps.

Matthews filed this three count complaint on October 30, 1997. Count one asserts violations of Title II of the Americans with Disabilities Act (ADA). Count two asserts violations of § 504 of the Rehabilitation Act. Count three asserts violations of the Arkansas Civil Rights Act. With respect to each count, Matthews alleges the County violated the respective statutes by failing to conduct a proper self-evaluation to identify compliance deficiencies and failing to correct deficiencies to ensure equal access to its services, programs and activities by those with disabilities. Additionally, he contends he was denied meaningful and equal access to public benefits, *i.e.*, access to the chancery court and proper restroom facilities.

Matthews seeks an award of compensatory damages, a declaration that defendant violated his rights, a permanent injunction prohibiting defendant from engaging in policies and practices which are violative of the ADA, the Rehabilitation Act, and the Arkansas Civil Rights Act, and an injunction requiring defendant to perform a proper self-evaluation and make those changes to existing and future facilities to bring its facilities into compliance with the ADA, the Rehabilitation Act, and the Arkansas Civil Rights Act. Plaintiff also seeks an award of attorney's fees and costs.

*Discussion.*

### I. Summary Judgment Standard.

The question before the court is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See e.g., Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Johnson v. Baptist Medical Center,* 97 F.3d 1070, 1072 (8th Cir.1996). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir.1990).

### II. ADA & Rehabilitation Act—Discrimination in Services.

#### 1. Program Accessibility.

Title II of the ADA became effective on January 26, 1992, and provides as follows:

---

7. As noted above, Matthews testified his cousin Doug helped him down the stairs after his second and third court appearances. *Matthews Deposition* at 36.

8. Exhaustion of grievance procedures is not a prerequisite to filing a complaint at the federal level. Appendix A to 28 C.F.R. § 35.170.

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

■ This provision is "intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability." *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir.1996). It "guards against both intentional discrimination and simple exclusion from services resulting not from intentional discriminatory acts, but rather from inaction, thoughtlessness, or equal treatment when particular accommodations are necessary." *Presta v. Peninsula Corridor Joint Powers Board*, 16 F.Supp.2d 1134, 1135 (N.D.Cal.1998).

> The statute's language demonstrates a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender, or race. Discrimination in the latter instances has been judicially defined as disparate treatment on the basis of a certain characteristic that identifies an individual as a member of a protected class. However, a person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation. In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory if their effect is to keep persons with disabilities from enjoying the benefits of services that, by law, must be available to them.

*Id.* (citation omitted). *See also Crowder*, 81 F.3d at 1483–84 ("Few would argue that architectural barriers such as stairs, or communication barriers such as the preference for the spoken word, are intentionally discriminatory. Yet, stairs can deny the wheelchair-bound access to services provided on the second floor of a government building; and communicating only by the spoken word can deny deaf persons the ability to find out that it is the second floor where they must go to obtain the services they seek.").

A "qualified individual with a disability" is broadly defined as any person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The term "public entity" is defined to be "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). It has been said "that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 1998 WL 442669, *5 (6th Cir. Aug.6, 1998).

Section 504 of the Rehabilitation Act which became effective in 1973 provides:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794. The phrase "program or activity" is defined to include "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b).

■ "The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.'" *Gorman v. Bartch*, 152 F.3d 907, 1998 WL 498601, *4 (8th Cir. August 20, 1998) (*quoting, Allison v. Department of Corrections*, 94 F.3d 494, 497 (8th Cir.1996)).

■ To effectuate the statutory mandates of the ADA the Department of Justice under the authority of 42 U.S.C. § 12134(a) promulgated regulations regarding the responsibilities of state and local governments to disabled persons. In view of the express delegation, the regulations are entitled to "controlling weight, unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467

U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The regulations state that "a public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

█ To establish a violation of either Act, plaintiff must demonstrate: "1) he is a qualified individual with a disability; 2) he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and 3) that such exclusion, denial of benefits, or other discrimination, was by reason of his disability." *Layton v. Elder,* 143 F.3d 469, 472 (8th Cir.1998). *See also Gorman v. Bartch,* 152 F.3d 907, 1998 WL 498601 (8th Cir. Aug.20, 1998).

█ In this case, it is undisputed that Matthews has a disability within the meaning of these Acts, that Marion County is a public entity which receives federal assistance, and that chancery court proceedings are services within the meaning of the Acts. Further, it is undisputed that the courthouse does not have an elevator, ramp, or other device making the second floor accessible to anyone with disabilities involving mobility and does not have restroom facilities accessible to wheelchairs.

"[C]arrying an individual with a disability is considered ineffective and therefore an unacceptable method for achieving program accessibility." Appendix A to 28 C.F.R. § 35.150(b)(1). Carrying is permitted only in manifestly exceptional cases, and only if all personnel who are permitted to participate in carrying an individual with a disability are formally instructed on the safest and least humiliating means of carrying. "Manifestly exceptional" cases in which carrying would be permitted might include, for example, programs conducted in unique facilities, such as an oceanographic vessel, for which structural changes and devices necessary to adapt the facility for use by

individuals with mobility impairments are unavailable or prohibitively expensive. Carrying is not permitted as an alternative to structural modifications such as installation of a ramp or a chairlift.
*Id.*

The Technical Assistance Manual for Title II in discussing the concept of program accessibility provides a helpful illustration which involves an almost identical situation. Specifically, illustration 2 to II–5.1000 provides as follows:

D, a defendant in a civil suit, has a respiratory condition that prevents her from climbing steps. Civil suits are routinely heard in a courtroom on the second floor of the courthouse. The courthouse has no elevator or other means of access to the second floor. The public entity must relocate the proceedings to an accessible ground floor courtroom or take alternative steps, including moving the proceedings to another building, in order to allow D to participate in the civil suit.

The County concedes, as it must, that carrying a mobility impaired individual is not an acceptable method of providing program accessibility in these circumstances. *Defendant's brief at* 10. However, it argues that it is reasonable for the courthouse to make alternative plans upon plaintiff's request. It states plaintiff never gave courthouse personnel the opportunity to make such arrangements, never filed a grievance, and never requested alternate accommodation.

The County offers no explanation for its decision to find individuals to carry plaintiff up the stairs the date of the first hearing rather than relocating the hearing. Once carried up to the courtroom, the County offers no explanation for its failure to ensure Matthews had access to restroom facilities or a means of returning to the first floor during the lunch recess or after court recessed for the day. Additionally, the County does not discuss the fact that not just one but three hearings were scheduled within a three or four month period in an inaccessible courtroom.[9] Assuming courthouse personnel were

---

9. Amazingly, the County also failed to mention in its motion for summary judgment that the chan-

cery court judge was himself wheelchair bound. The County apparently made some type of ar-

unaware of plaintiff's disability prior to the first hearing, they were certainly aware of it prior to the second and third hearings. It is also undisputed that all the events that are the subject of this lawsuit fell well after the date the County was required to comply with Title II.

As plaintiff correctly points out, the Court of Appeals for the Eighth Circuit in *Layton v. Elder*, 143 F.3d 469 (8th Cir.1998) addressed an almost identical situation.[10] In that case, Richard Layton and Billy Penny contended Montgomery County, Arkansas, discriminated against them in violation of Title II of the ADA and § 504, 29 U.S.C. § 794, of the Rehabilitation Act, in connection with programs and services offered in the county courthouse. Both Layton and Penny are disabled. *Layton*, 143 F.3d at 470. Layton is confined to a wheelchair. *Id.* Penny suffers from various conditions which require him to use crutches on a frequent basis and occasionally he uses a wheelchair. *Id.*

At the time the lawsuit was filed, the wheelchair ramp leading to the courthouse was too steep, the courthouse restrooms were not adequate to accommodate a wheelchair, and the second floor of the building where quorum court meetings were held was inaccessible. *Id.* at 471. In August of 1995, Layton first had difficulty locating a handicapped parking place and then was unable to attend a quorum court meeting because it was held on the second floor of the building. *Id.* In December of 1995, Layton was required to attend court on a violation citation. *Id.* On that occasion, the presiding judge conducted court in the first floor hallway to accommodate Layton. *Id.* Penny was not denied access to the courthouse. *Id.* "Neither Layton nor Penny requested accommodation or suggested an alternative site for any Montgomery County services, activities,

or programs for which they were eligible." *Id.*

After a bench trial, the district court held that the plaintiffs had established a statutory violation. *Id.* at 472. The Eighth Circuit found no error in this ruling. *Id.* The Eighth Circuit noted that plaintiffs' primary complaint was "that the services, programs, and activities, including court proceedings, held on the second floor of the county courthouse are not accessible to citizens with mobility impairments." *Id.* at 471. It said that "[t]he steps taken by the county towards ADA compliance, while commendable, have not addressed this problem." *Id.*

While the court understands the predicament that public entities like Marion County find themselves in because of unfunded Congressional dictates, and sympathizes with them, the court has no choice but to conclude that the plaintiff has established that the County is in violation of the requirements of Title II of the ADA and § 504 of the Rehabilitation Act. The County has excluded mobility impaired individuals from participation in its services, programs, or activities by failing to make those services, programs, or activities readily accessible to and usable by individuals with disabilities.

## 2. Availability of Compensatory Damages.[11]

■ Title II, 42 U.S.C. § 12133, incorporates by reference the "remedies, procedures, and rights" provisions of 29 U.S.C. § 794a. Section 794a contains separate provisions for employment-based complaints, 29 U.S.C. § 791, and complaints of discrimination against entities receiving federal assistance, 29 U.S.C. § 794. 29 U .S.C. § 794a(a)(1) and (2) Title II, parallels § 504 of the Rehabilitation Act, 29 U.S.C. 794, so the second set of remedies contained in

---

rangements to have the judge carried to and from the courtroom and presumably made arrangements for him to use a restroom.

**10.** Although defendant did not cite *Layton* in its brief, the court noted with interest, as did plaintiff, that counsel for defendant was also involved in that case.

**11.** The court by letter dated September 21, 1998, *sua sponte* raised the issues of the availability of compensatory damages and the availability of a jury trial in program accessibility cases. Both sides were directed to brief these issues. The court has received and reviewed the supplemental briefs filed by both sides.

§ 794a(a)(2) applies. *Johnson v. City of Saline,* 151 F.3d 564, 572–73 (6th Cir.1998).[12]

In turn, § 794a(a)(2) incorporates the remedies, procedures, and rights provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Thus, "[t]hese statutes require that the ADA and the Rehabilitation Act remedies be construed the same as remedies under Title VI." *Ferguson v. City of Phoenix,* 157 F.3d 668, 672 (9th Cir.1998) ("By statute, the remedies for violations of the ADA and the Rehabilitation Act are co-extensive with each other, 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2), and are linked to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*"). *See also Layton v. Elder,* 143 F.3d 469, 472 (8th Cir.1998) ("The rights, procedures, and enforcement remedies under Title II are the same as under section 504.").

Compensatory damages have been held to be available for violations of § 504. For instance, the Eighth Circuit has said that "[p]laintiffs who prevail on Rehabilitation Act claims are entitled to the full spectrum of legal and equitable remedies needed to redress their injuries." *Gorman v. Bartch,* 152 F.3d 907, 908 (8th Cir.1998). The Eighth Circuit has similarly held in a Title VI case. *Rodgers v. Magnet Cove Public Schools,* 34 F.3d 642, 645 (8th Cir.1994). Obviously then, the full spectrum of remedies is available in Title II cases.[13] *See also Jeremy H. by Hunter v. Mount Lebanon School Dist.,* 95 F.3d 272, 279 (3d Cir.1996) (monetary damages are permitted under Title II of the ADA).

However, the fact that these remedies are available does not necessarily mean they are available in all cases. In neither *Gorman* or *Rodgers* did the Eighth Circuit discuss whether compensatory damages could be recovered by a particular plaintiff in the absence of a showing of discriminatory animus or intent. The courts examining this issue in the context of Title VI have generally held that to receive compensatory damages the plaintiff must prove discriminatory intent. *See, Guardians Ass'n v. Civil Service Comm'n,* 463 U.S. 582, 602–03, 103 S.Ct. 3221, 3232–33, 77 L.Ed.2d 866 (1983); *Canutillo Independent School Dist. v. Leija,* 101 F.3d 393 (5th Cir.1996), *cert. denied,* 520 U.S. 1265, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997); *Smith v. University of Washington Law School,* 2 F.Supp.2d 1324 (W.D.Wash.1998); *Godby v. Montgomery County Bd. of Education,* 996 F.Supp. 1390 (M.D.Ala.1998); *Tafoya v. Bobroff,* 865 F.Supp. 742, 749–50 (D.N.M.1994), *aff'd without op.,* 74 F.3d 1250 (10th Cir.1996). *See also Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 1035, 117 L.Ed.2d 208 (1992) (noting that "a clear majority" in *Guardians Ass'n* would allow damages in actions for intentional violations of Title VI.).

Plaintiff argues that the Eighth Circuit would not require a showing of intentional discrimination before compensatory damages may be recovered. He concedes this circuit has not yet ruled on the point but argues that, if one considers the fact that the *Rodgers* opinion cited to *Franklin* and couples this with a consideration of the reasoning of Judge Tashima in his dissent in *Ferguson,* the necessary conclusion is that the Eighth Circuit would not require a showing of intentional discrimination.

We disagree. In *Ferguson,* the Ninth Circuit held that compensatory damages were not available under Title II or § 504 absent a showing of discriminatory intent. *Ferguson,* 157 F.3d 668, 674. *See also Wood v. President and Trustees of Spring Hill College,* 978 F.2d 1214 (11th Cir.1992) (compensatory damages not available for unintentional violations of the Rehabilitation Act); *Carter v.*

---

**12.** Section 12133 does not distinguish between 29 U.S.C. § 794a(a)(1) and § 794a(a)(2). Some commentators and courts have found this confusing and/or have felt it necessary to address the availability of compensatory damages under both sections. *See e.g., Tafoya v. Bobroff,* 865 F.Supp. 742, 748–49 (D.N.M.1994), *aff'd without op.,* 74 F.3d 1250 (10th Cir.1996) and 1 *Americans with Disabilities* § 2:159 (C. Angela Van Etten et al. eds.1997).

**13.** The Eighth Circuit has not yet addressed the issue of whether punitive damages are available under Title II of the ADA or § 504. *Gorman v. Bartch,* 152 F.3d 907, 1998 WL 498601, *9 (8th Cir. August 20, 1998) (noting that the Sixth Circuit had ruled punitive damages were not available in *Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 792 (6th Cir.1996)).

*Orleans Parish Public Schools*, 725 F.2d 261 (5th Cir.1984). We believe the court in *Ferguson* reached the correct result. Thus in order to recover compensatory damages, Matthews must prove discriminatory intent.

Assuming we hold that a showing of discriminatory intent is necessary, plaintiff argues that, despite his deposition statement, there was no animosity on the part of county officials there is sufficient evidence in the record to create a genuine issue of material fact. We agree. Although we do not necessarily agree that the County's failure to install a chairlift despite the availability of sufficient funds indicates intentional discrimination, we believe the fact that three hearings over a period of months were scheduled in an inaccessible courtroom at least creates an issue of fact. Similarly, we believe an issue of fact is created by the County's conduct in arranging for Matthews to be carried up to the first hearing and then failing to make any arrangements to provide him access to restroom facilities or to the first floor at the conclusion of the court proceeding.

### 3. Availability of a Jury Trial.

"Prior to the Civil Rights Act of 1991, there was no provision for the right of a jury trial under the ADA, the Rehabilitation Act of 1973, or the Civil Rights Act of 1964." *Outlaw v. City of Dothan, Alabama*, 3 A.D. Cases 939, 1993 WL 735802 (M.D.Ala. April 27, 1993). The jury trial provision of the Civil Rights Act of 1991, however, applies only to Title I of the ADA. 42 U.S.C. §§ 1981a(a)(2) and 1981a(c). Thus, there is no provision extending the right to a jury trial to cases brought under Title II of the ADA or the Rehabilitation Act. *See Tyler v. City of Manhattan*, 849 F.Supp. 1442 (D.Kan.1994), *aff'd*, 118 F.3d 1400 (10th Cir. 1997); *Outlaw v. City of Dothan, Alabama*, 3 A.D. Cases 939, 1993 WL 735802 (M.D.Ala. April 27, 1993). *See also* 1 *Americans with Disabilities—Practice and Compliance Manual* § 2:151 (C. Angela Van Etten et al. eds., 1997); 1 Henry H. Perritt, Jr., *Americans with Disabilities Act Handbook* § 9.34 (3d ed.1997).[14]

Where a statutory enactment is silent on the issue of the availability of a jury trial, the question becomes whether the Seventh Amendment to the United States Constitution affords such a right. "The issue of whether a party is entitled to a jury trial under the Seventh Amendment is a question of law." *Kampa v. White Consolidated Industries, Inc.*, 115 F.3d 585, 586 (8th Cir. 1997) (holding the right to a jury trial attached to claims brought under the Missouri Human Rights Act because it permitted the recovery of actual and punitive damages even though the statute said the actions should be heard and determined by a judge sitting without a jury).

"The Seventh Amendment preserves the right to a jury trial in 'suits at common law' filed in federal court." *Kampa*, 115 F.3d at 586.

> Such suits include those in which legal rights and remedies, as distinguished from equitable rights and remedies, are to be determined. Since the merger of the courts of law and equity, the Seventh Amendment right to a jury trial has been carefully preserved. "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to jury trial should be scrutinized with the utmost care."

*Kampa*, 115 F.3d at 586 (*quoting Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501, 79 S.Ct. 948, 952, 3 L.Ed.2d 988 (1959)).

To resolve the issue of the availability of a jury trial under the Seventh Amendment when the statute does not provide the answer on its face, the Supreme Court has established a two-pronged standard. *See Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry*, 494 U.S. 558, 565, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990). *See also Cass County Music Co. v. C.H.L.R., Inc.*, 88 F.3d 635, 641 (8th Cir.1996). First, the na-

---

**14.** In *Hernandez v. City of Hartford*, 959 F.Supp. 125, 133–34 (D.Conn.1997) the court held that Title II encompassed employment discrimination claims and also held that since the full spectrum of equitable and legal remedies was available under Title II a jury trial was available.

ture of the statutory action is compared to 18th–century actions brought in the English courts prior to the merger of the courts of law and equity. Second, the remedy sought is examined to determine whether it is legal or equitable in nature. *Cass County,* 88 F.3d at 641 (citations omitted). The Supreme Court has stressed that the second inquiry is the "more important" of the two. *Terry,* 494 U.S. at 565, 110 S .Ct. at 1344 (*citing Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989)); *See also Wooddell v. International Brotherhood of Elec. Workers, Local 71,* 502 U.S. 93, 97, 112 S.Ct. 494, 498, 116 L.Ed.2d 419 (1991).

With respect to this first inquiry, the Fourth Circuit in examining § 504 noted that a § 504 action had been "previously characterized as a type of tort or contract action for which suits at law were available if the proper type of damages were requested." *Pandazides v. Virginia Board of Education,* 13 F.3d 823 (4th Cir.1994). The *Pandazides* case involved a claim brought by a former teacher alleging the Virginia Board of Education discriminated on the basis of disability during the National Teacher Examination. The Fourth Circuit noted that it had previously held that Rehabilitation Act claims involve injuries to individuals and are analogous to personal injury claims. *Pandazides,* 13 F.3d at 829 (*citing Wolsky v. Medical College of Hampton Roads,* 1 F.3d 222, 224 (4th Cir.1993), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 881, 127 L.Ed.2d 77 (1994)). Since tort action could be brought in either courts of law or courts of equity, the court held it was necessary to address the second question, *i.e.,* the character of damages available. *Pandazides,* 13 F.3d at 829. It went on to conclude that, since a full panoply of legal remedies was available in cases involving intentional discrimination, a jury trial was available. *Id.* at 829–832.

Interestingly, defendant agrees that the type of action involved in this case is appropriately characterized as a tort action. *See Defendant's October 6, 1998, brief at 6.* Further defendant does not dispute that the full spectrum of legal and equitable remedies are available in cases involving intentional dis-crimination. *Id.* at p. 2 & p. 6. Rather, defendant relies solely on its argument that this case does not involve intentional discrimination. As no intentional discrimination is involved, it argues only equitable remedies are available and under these circumstances no right to jury trial exists. For the reasons discussed, we believe this case does present a genuine issue of fact regarding the existence of intentional discrimination.

Although the Eighth Circuit has recognized that not every award of monetary relief constitutes a legal remedy, it has stated that money damages are generally characterized as a legal remedy. *Kampa,* 115 F.3d at 586. *See also Mertens v. Hewitt Assocs.,* 508 U.S. 248, 254, 113 S.Ct. 2063, 2068, 124 L.Ed.2d 161 (1993) (Compensatory damages are the classic form of legal relief). In *Cass County,* the court noted that "the assessment of money damages by a jury is a fundamental component of common-law trial by jury." *Cass County,* 88 F.3d at 642. And in *Gipson v. KAS Snacktime Co.,* 83 F.3d 225 (8th Cir. 1996), it stated that "[t]he Seventh Amendment right to [a] jury trial extends to statutory causes of action, so long as the statute allows, and the plaintiff seeks, at least in part a legal remedy." *Id.* at 231. This is true, "even if those [legal] damages are merely 'incidental' to equitable relief." *Gipson,* 83 F.3d at 230.

We therefore hold that a jury trial is available in Title II and § 504 cases where the plaintiff claims intentional discrimination exists and seeks legal relief in the form of monetary damages. We do not hold that a jury trial is constitutionally required in every Title II or § 504 action.

**5. Mandatory Injunctive Relief.**

The County also argues any mandatory injunctive relief is inappropriate as Matthews has not shown a compelling reason warranting an injunctive remedy. Once again, the County points out there is no evidence any official of the County was asked to accommodate Matthews' attendance or that he was denied assistance in accessing the courtroom. Additionally, it argues there is no evidence that Matthews has ever been excluded from any county facility, or has been denied par-

ticipation in any county program or service, or has ever requested any type of accommodation.

It argues that were a public entity makes dutiful progress to remedy an asserted violation, a federal court should use restraint when considering injunctive relief. Since it has purchased the old AP & L building and plans to have a completely accessible courthouse, the County contends there is no cognizable danger of recurrent violations. In fact, defendant now informs the court that the AP & L building has been completed and can be used as an accessible courthouse. Thus, it argues the issue of injunctive relief is moot.

The County also reminds the court that it has adopted a written policy expressing its intent to comply with the ADA and has taken substantial affirmative action by developing a compliance plan, forming an oversight board, developing a grievance procedure, and initiating the removal and/or modification of barriers limiting access. It "recognizes that its failure to timely comply with Title II of the ADA is not excused," but argues it has made a good faith effort to achieve full compliance with Title II. *Defendant's brief at 9.* When all these circumstances are considered, it contends there is no need for a mandatory injunction.

As plaintiff points out, the *Layton* case also addressed the propriety of the issuance of injunctive relief. In *Layton* the district court concluded that entry of a mandatory injunction was not appropriate. *Layton,* 143 F.3d at 471. On appeal, the Eighth Circuit reviewed this decision for abuse of discretion. *Id.* at 472. It found that the trial court abused its discretion by not ordering mandatory injunctive relief after finding violations of the ADA and the Rehabilitation Act at the county courthouse. *Id.*

Once actual success on the merits has been demonstrated, the Eighth Circuit noted that three factors should be considered in determining whether "injunctive relief is appropriate: (1) the threat of irreparable harm to the movant; (2) the harm to be suffered by the nonmoving party if the injunction is granted; and (3) the public interest at stake." *Layton,* 143 F.3d at 472 (citations omitted).

The Eighth Circuit noted that Layton and Penny had succeeded on the merits:

and they will suffer substantial irreparable harm if the programs, services and activities held in the Montgomery County Courthouse are not made accessible as required under the statutes. Furthermore, public interest strongly favors mandating accessibility. When these factors are balanced against the harm to the county of making its programs, services, and activities accessible the balance tips heavily in favor of granting appellants the relief they request.

*Id.* Therefore, the Eighth Circuit held it was an abuse of discretion to deny Layton and Penny mandatory injunctive relief. *Id.*

The case was remanded to the district court for "entry of an injunction mandating that the county make each county service, program, and activity, when viewed in its entirety, readily accessible and usable by individuals with disabilities in accordance with 28 C.F.R. § 35.150." *Id.* at 472–73. The court emphasized that "if the county intends to continue using the county courthouse to provide services, programs, and activities, it must make the parking accommodations and the building accessible to individuals with disabilities in accordance with 28 C.F.R. § 35.151." *Id.* at 473.

It may well be that the question of injunctive relief is moot if, as the County represents, the AP & L building is now being used as a courthouse. However, the court has been provided insufficient information on this point to so rule.

### III. ADA & Rehabilitation Act—Self-evaluation Claims.

The ADA itself does not require local governments to initiate self-evaluations. However, the implementing regulations require any public entity to evaluate its current services, policies, and practices and the effects thereof by January 26, 1993. 28 C.F.R. § 35.105(a). "The self-evaluation requirement does not stay the effective date of the statute.... Public entities are, therefore, not shielded from discrimination claims during that time." Appendix A to 28 C.F.R. § 35.105.

As to existing facilities, the regulations provide as follows:

A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

(2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

28 C.F.R. § 35.150(a).

Where structural changes are necessary to comply with the ADA, "such changes shall be made within three years of January 26, 1992, but in any event as expeditiously as possible." 28 C.F.R. § 35.150(c). Any public entity employing fifty or more persons, was required to develop within six months of January 26, 1992, a transition plan outlining the methods in which its programs, services, and activities will be made accessible. 28 C.F.R. § 35.150(d).

At a minimum, the plan shall "(i) Identify physical obstacles in the public entity's facilities that limit the accessibility of its programs or activities to individuals with disabilities; (ii) Describe in detail the methods that will be used to make the facilities accessible; (iii) Specify the schedule for taking the steps necessary to achieve compliance with this section and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period; and (iv) Indicate the official responsible for implementation of the plan." 28 C.F.R. § 35.150(d)(3). The County concedes that its transition plan does not describe in detail the methods to be undertaken to make the facilities identified in the plan accessible, 28 C.F.R. § 35.150(d)(3)(ii), or contain a schedule for taking steps necessary to achieve compliance with the regulations, 28 C.F.R. § 35.150(d)(3)(iii). *Defendant's Brief* at 7.

"Significantly, neither the [ADA] nor the aforementioned regulations provide for a mechanism for enforcement of the self-evaluation requirement. However, there is a private right of action for enforcement of ADA regulations to require public entities to implement ADA nondiscriminatory standards and proceed to make necessary modifications." *Miller v. City of Johnson City, Tennessee,* 5 A.D. Cases 993, 1996 WL 406679, *2 (E.D.Tenn.1996) (*citing, McCready v. Michigan State Bar,* 881 F.Supp. 300, 306 (W.D.Mich.1995) and *Tyler v. City of Manhattan,* 857 F.Supp. 800, 816 (D.Kan.1994)).

These actions must be premised on disability-related discrimination, 42 U.S.C. § 12133. *McCready v. State Bar Standing Committee,* 926 F.Supp. 618, 622 (W.D.Mich. 1995), *aff'd without op.,* 100 F.3d 957 (6th Cir.1996). "To state a valid claim for enforcement of the self-evaluation requirements, plaintiff must allege a clear causal connection between defendant's failure to

evaluate its services and his asserted injury." *Id.* (citation omitted).

It has been held that money damages against a public entity for failure to formulate a transition plan or timely comply with the plan are not available. *Miller,* 1996 WL 406679, *2; *Tyler v. City of Manhattan,* 849 F.Supp. 1442, 1443–45 (D.Kan.1994) We agree with this holding. However as noted above, plaintiff may use evidence of failure to comply with these requirements to buttress his claim of discrimination. He just may not recover separate damages due to a failure to complete the proper self-evaluation or transition plan or to comply with the time line set forth therein.

### IV. Arkansas Civil Rights Claim.

■ The Arkansas Civil Rights Act, provides a cause of action for discrimination offenses. Ark.Code Ann. § 16–123–107 (Supp.1997). Specifically, § 16–123–107 provides as follows:

> (a) The right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
> \*   \*   \*   \*   \*   \*
>
> (2) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement;
>
> \*   \*   \*   \*   \*   \*
>
> (b) Any person who is injured by an intentional act of discrimination in violation of subdivisions (a)(2)–(5) of this section shall have a civil action in a court of competent jurisdiction to enjoin further violations, to recover compensatory and punitive damages, and, in the discretion of the court, to recover the cost of litigation and a reasonable attorney's fee.

Ark.Code Ann. § 16–123–107 (Supp.1997).

The provisions of this Act are parallel to and are coterminous with the coverage of Title II of the ADA and § 504 of the Rehabilitation Act. For the reasons discussed in detail above with regard to those claims, we believe the plaintiff has established a statutory violation of the Arkansas Civil Rights Act. Further, we believe plaintiff has created a genuine issue of material fact with respect to the existence of intentional discrimination.

*Conclusion.*

For the reasons stated, defendant's motion for summary judgment is denied and plaintiff's cross-motion for summary judgment on liability is granted. The court will determine what injunctive relief, if any, should be granted after hearing the evidence at trial.

A separate order in accordance herewith will be concurrently entered.