*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 04a0340p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ABILITY CENTER OF GREATER TOLEDO, et al.,
    *Plaintiffs-Appellees/*
    *Cross-Appellants,*

    *v.*

CITY OF SANDUSKY and GERALD A. LECHNER, in his
official capacity,

    *Defendants-Appellants/*
    *Cross-Appellees.*

Nos. 03-3277/3339

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 99-07555—James G. Carr, District Judge.

Argued: June 11, 2004

Decided and Filed: October 1, 2004

Before: KEITH, CLAY, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** William P. Lang, Avon Lake, Ohio, for Appellants. Thomas J. Zraik, ZRAIK LAW OFFICES, Sylvania, Ohio, for Appellees. **ON BRIEF:** On Brief:William P. Lang, Avon Lake, Ohio, for Appellants. Thomas J. Zraik, ZRAIK LAW OFFICES, Sylvania, Ohio, for Appellees.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Ability Center of Greater Toledo, Statewide Independent Living Council, and five individuals with disabilities[1] – collectively, the plaintiffs-appellees/cross-appellants – filed this class action lawsuit against defendants-appellants/cross-appellees the City of Sandusky, Ohio, and Gerald A. Lechner (in his official capacity as Sandusky's city manager). Plaintiffs alleged that defendants violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165, and related regulations by failing to install proper accommodations for disabled individuals in the course of renovating Sandusky sidewalks and street curbs, and by failing to develop a transition plan for

---

[1]These individuals are Cora Lee Bosworth, Mary Butler, Shona Eakin, Woody Osburn, and Tracy Justesen.

implementing ADA requirements.  The district court granted summary judgment to plaintiffs on the former claim and summary judgment to defendants on the latter.  Defendants filed a motion for reconsideration of the district court's grant of partial summary judgment to plaintiffs, which was denied.  Defendants now appeal this grant of partial summary judgment to plaintiffs and the denial of their motion for reconsideration, while plaintiffs cross-appeal the district court's grant of partial summary judgment to defendants.  For the following reasons, we affirm.[2]

## I.

In a class action complaint filed on September 8, 1999, plaintiffs asserted two basic claims against defendants.  First, plaintiffs alleged that, in the process of replacing and repairing certain Sandusky sidewalks and street curbs, defendants failed to install proper curb cuts and ramps in accordance with 28 C.F.R. § 35.151.  Second, plaintiffs alleged that defendants failed to adopt a transition plan pursuant to 28 C.F.R. § 35.150(d).  Plaintiffs sought declaratory and injunctive relief as well as monetary damages.  Each side filed a motion for summary judgment on these claims.

On February 16, 2001, the district court entered an interlocutory order granting in part and denying in part the parties' respective motions.  Specifically, the court granted summary judgment to plaintiffs on their first claim, finding that defendants did not comply with § 35.151 when altering various Sandusky streets, sidewalks, and curbs.  With respect to their second claim, the court held that Title II does not provide a private right of action for the enforcement of § 35.150(d) and accordingly granted summary judgment to defendants.  The court also concluded that plaintiffs were not entitled to compensatory or punitive damages because such damages are not available under Title II absent proof of intentional discrimination, which plaintiffs could not show.

Defendants filed a motion for reconsideration with the district court on April 25, 2001, pursuant to Fed. R. Civ. P. 59(e).  They argued that the then newly decided case of *Alexander v. Sandoval*, 532 U.S. 275 (2001), demonstrates that Title II does not provide private parties a cause of action for pursuing violations of § 35.151.  Plaintiffs opposed the motion, as did the Department of Justice, which filed an *amicus curiae* brief in support of plaintiffs' position.  The district court ultimately disagreed with defendants and denied their motion.

On January 17, 2003, the district court entered a final order certifying the class, granting plaintiffs declaratory and injunctive relief on their § 35.151 claim, awarding plaintiffs attorneys' fees, and establishing a scheme for monitoring defendants' compliance with the order.  Defendants filed a timely appeal and now challenge the district court's grant of partial summary judgment to plaintiffs and its denial of their motion for reconsideration, arguing that the court erred in finding that plaintiffs have a private cause of action under Title II to challenge violations of § 35.151.  Plaintiffs cross-appeal the district court's grant of partial summary judgment to defendants, arguing that Title II provides them a private cause of action for challenging defendants' failure to adopt a transition plan in accordance with § 35.150(d).

## II.

We review a district court's grant of partial summary judgment *de novo*, *Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 797 (6th Cir. 2001), as we do a district court's denial of a motion

---

[2] The Supreme Court recently decided in *Tennessee v. Lane*, 124 S.Ct. 1978 (2004), that Title II does not abrogate state sovereign immunity in violation of the Eleventh Amendment to the extent that it requires states to grant disabled individuals access to courthouses by providing them with reasonable accommodations.  This case presents no Eleventh Amendment issue since the amendment protects only states and not municipalities. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1979); *see also Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 (2001) ("[T]he Eleventh Amendment does not extend its immunity to units of local government.").

seeking reconsideration of a grant of summary judgment. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454-55 (6th Cir. 2003).

## A.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 202, 42 U.S.C. § 12132. "Public entity" includes "any state or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." § 201, 42 U.S.C. § 12131(1)(A) & (B). The Act grants the Attorney General authority to promulgate regulations to implement its provisions. § 204, 42 U.S.C. § 12134. Pursuant to § 204, the Attorney General adopted 28 C.F.R. § 35.151, which provides that alterations of facilities[3] commenced after January 26, 1992, "by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities." *Id*. § 35.151(b). The regulation further specifies that alterations should meet certain accessibility standards, *id.* § 35.151(c), and that altered streets and pedestrian walkways must contain curb ramps. *Id*. § 35.151(e). Section 35.151 is part of a broader regulatory scheme that aims to effectuate § 202 of the ADA. *See* 28 C.F.R § 35.101. The scheme makes explicit that "no qualified individual with a disability shall, *because a public entity's facilities are inaccessible to or unusable by individuals with disabilities*, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." *Id*. § 35.149 (emphasis added).

Defendants do not dispute the district court's finding that they failed to comply with § 35.151,[4] nor do they assault the reasonableness or validity of the regulation or of Title II more generally. Rather, they argue only that – in light of *Sandoval* – the ADA provides a private cause of action under Title II solely for claims based on intentional discrimination.[5] Since the district court found that they did not intentionally discriminate against plaintiffs, the defendants contend, plaintiffs have no valid cause of action against them under Title II to enforce § 35.151 and obtain injunctive or declaratory relief.[6] Limiting our inquiry to the issue presented to us, we now turn to defendants' argument.

Title II stipulates that "[t]he remedies, procedures, and rights set forth in [§ 505 of the Rehabilitation Act, 29 U.S.C. § 794a,] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." § 203, 42 U.S.C.

---

[3] Facilities include roads and walks. 28 C.F.R. § 35.104.

[4] The parties and the district court characterized the defendants' failure to meet the requirements of § 35.151 as a form of disparate impact discrimination. It is not clear that this characterization is apt. The Second Circuit has held that, under Title II, "a claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276-77 (2d Cir. 2003); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 690-91 (9th Cir. 2001) (stating that Title II of the ADA "not only prohibits public entities from discriminating against the disabled, it also prohibits public entities from *excluding* the disabled from participating in *or* benefitting from a public program, activity, or service solely by reason of disability") (quotation omitted). We need not decide how violations of § 35.151 should be characterized because it is unnecessary to the resolution of this appeal.

[5] Aside from seeking relief for disability discrimination by filing a lawsuit, a private party has the option of filing a complaint of disability discrimination with the appropriate federal agency, 28 C.F.R. § 35.170, which shall then investigate the complaint and attempt to obtain compliance from an offender if it finds that discrimination has occurred. *Id*. §§ 35.172 – .174.

[6] The issue of whether a private cause of action exists under Title II for monetary relief absent evidence of intentional discrimination is not before us. The district court rejected plaintiffs' request for monetary relief because they failed to offer evidence of intentional discrimination, and plaintiffs do not appeal this ruling.

§ 12133. Section 505 of the Rehabilitation Act, in turn, adopts "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964." 29 U.S.C. § 794a(a)(2).[7] In short, the remedies, procedures, and rights available under Title II of the ADA parallel those available under Title VI of the Civil Rights Act of 1964.

In *Sandoval*, the Supreme Court addressed the scope of private causes of action available under § 601 of Title VI, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The case involved a regulation promulgated under Title VI by the United States Department of Justice pursuant to § 602, 42 U.S.C. § 2000d-1, that prohibited recipients of federal funding from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin." 28 C.F.R. § 42.104(b)(2) (2000). The plaintiffs claimed that the Alabama Department of Public Safety – a recipient of federal funds – violated the regulation by administering state driver's license exams only in English, which it did in accordance with an amendment to the Alabama constitution that declared English as the state's official language.

The Court considered whether the plaintiffs could, as private parties, proceed on their disparate impact claim and secure injunctive relief.[8] The Court began by noting that "private rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. Whether a statute provides for a private cause of action, it continued, depends upon whether the statute in question demonstrates that it was Congress's intent to create such a cause of action. *Id.* The Court recognized that it had already determined that Congress intended that private individuals be able to sue to enforce § 601 and obtain both injunctive relief and damages. *Id.* at 279. Yet, § 601 prohibits only intentional discrimination. *Id.* at 280. Since "[a] Congress that intends [a] statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be enforced as well," the Court found that any Title VI regulations properly effectuating § 601's ban on intentional discrimination would be enforceable through the private cause of action available under that provision. *Id.* at 284. However, the Court proceeded, as § 601 does not itself prohibit actions that disparately impact racial groups, related regulations that proscribe disparate impacts – such as 28 C.F.R. § 42.104(b)(2) – do not simply apply the provision. *Sandoval*, 532 U.S. at 285. Hence, the private cause of action available for enforcing § 601 does not extend to such regulations. *Id.* If a private cause of action existed to enforce 28 C.F.R. § 42.104(b)(2), the Court reasoned, it could only originate from § 602, the provision of Title VI pursuant to which the regulation was adopted. *Sandoval*, 532 U.S. at 286. Ultimately, the Court concluded that there was no indication in Title VI that Congress intended § 602 independently to provide for a private cause of action and, therefore, that no private cause of action existed for enforcing the disparate impact prohibitions of § 42.104(b)(2). *Sandoval*, 532 U.S. at 288-93.

---

[7] Section 505 actually offers two sets of remedies, "one for employment discrimination (§ 794a(a)(1)), and one for discrimination by entities providing federal assistance (§ 794a(a)(2))." *Johnson v. City of Saline*, 151 F.3d 564, 573 (6th Cir. 1998). As this court explained in *Johnson*, the remedies enumerated at § 794a(a)(2) apply in Title II cases. *Id.*; *see also Barnes v. Gorman*, 536 U.S. 181, 189 n.3 (2002) (recognizing that the remedies, procedures, and rights available under § 794a(a)(2) are those available under Title II); *Olmstead v. L.C.*, 527 U.S. 581, 590 n.4 (1999) (same).

[8] The Court expressly limited its inquiry to whether the regulation in question could be enforced through a private cause of action. The Court noted:

We do not inquire here whether the DOJ regulation was authorized by § 602 . . . . The petition for writ of certiorari raised, and we agreed to review, only the question posed in the first paragraph of this opinion: whether there is a private cause of action to enforce the regulation.

*Sandoval*, 532 U.S. at 279. Indeed, the Court assumed the regulation at issue was valid. *Id.* at 282. Likewise, we assume 28 C.F.R. § 35.151 is a validly enacted regulation. *See also Olmstead*, 527 U.S. at 592 (discussing Title II regulations and noting that "[w]e recite these regulations with the caveat that we do not here determine their validity").

What *Sandoval* makes clear is that a private plaintiff cannot enforce a regulation through a private cause of action generally available under the controlling statute if the regulation imposes an obligation or prohibition that is not imposed generally by the controlling statute. *See id*. at 284-85. On the other hand, if the regulation simply effectuates the express mandates of the controlling statute, then the regulation may be enforced via the private cause of action available under that statute. *Id*. at 284. For example, if a statutory provision prohibits only intentional discrimination, as was the case in *Sandoval*, regulations adopted to effectuate the provision may be enforceable through its private cause of action only to the extent that they, too, prohibit intentional discrimination.

The Court has recognized that § 202 of Title II, 42 U.S.C. § 12132, is enforceable through a private cause of action. *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *see also Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 8 (1st Cir. 2000) ("Although Title II does not expressly authorize a private cause of action, it adopts the remedial scheme of Title VI of the Civil Rights Act of 1964, under which there is an implied private cause of action."). This private right of action exists under § 203 of Title II, 42 U.S.C. § 12133, and derives from the fact that § 203 ultimately adopts the remedies, procedures, and rights set forth in Title VI, which, as noted, is itself enforceable through a private cause of action. *Barnes*, 536 U.S. at 185. Plaintiffs' claims are based upon defendants' failure to meet the requirements of 28 C.F.R. § 35.151, which was promulgated pursuant to 42 U.S.C. § 12134 to effectuate § 202. *See* 28 C.F.R. § 35.101. Whether 28 C.F.R. § 35.151 is enforceable through Title II's private cause of action, then, depends on whether the regulation effectuates a mandate of § 202.[9] If the architectural requirements imposed on public entities by § 35.151 effectuate a mandate of § 202, then the regulation is enforceable through the private cause of action available under Title II. On the other hand, if the regulation's architectural requirements impose unique obligations on public entities not contemplated by § 202, then the regulation is not enforceable through Title II's private cause of action.

We find that 28 C.F.R. § 35.151 effectuates a mandate of Title II and is therefore enforceable through the private cause of action available under the statute. Title II does more than prohibit public entities from intentionally discriminating against disabled individuals. It also requires that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide. Moreover, Title II contemplates that such accommodations must sometimes come in the form of public entities removing architectural barriers that impede disabled individuals from securing the benefits of public services.

The Supreme Court provided considerable guidance on these matters in its recent decision in *Lane*. In the context of deciding that – to the extent that it requires public entities to provide qualified disabled individuals meaningful access to courthouses – Title II does not violate the Eleventh Amendment by impermissibly abrogating state sovereign immunity, the Court described the purpose of Title II and the nature of the obligations it creates:

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility. 42 U.S.C. § 12131(2). But Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs. It requires only "reasonable modifications" that would not fundamentally alter the nature of the service provided, and only when the

---

[9] Because "private rights of action to enforce federal law must be created by Congress," *Sandoval*, 532 U.S. at 286, the fact that 28 C.F.R. § 35.172 states that a private party who has filed a disability discrimination complaint with the appropriate agency may "at any time . . . file a private suit pursuant to section 203 of the [ADA]" does not authoritatively demonstrate that Title II regulations are enforceable through a private cause of action. Furthermore, by stating that private suits may be filed "pursuant to section 203," the regulation merely begs the question of what types of private suits may be filed under that provision, a question we address here.

individual seeking modification is otherwise eligible for the service. *Ibid. As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways. In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards.* 28 C.F.R. § 35.151 (2003).

*Lane*, 124 S.Ct. at 1993 (emphasis added). Justice Ginsburg, in concurrence, noted that "Congress' objective in enacting the Americans with Disabilities Act [was] the elimination or reduction of physical and social structures that impede people with some present, past, or perceived impairments from contributing, according to their talents, to our Nation's social, economic, and civic life." *Id.* at 1996 (Ginsburg, J., concurring). Justice Ginsburg continued, "Congress understood in shaping the ADA [that it] would sometimes require not blindfolded equality, but responsiveness to difference; not indifference, but accommodation." *Id.* The clear implication of *Lane* is that Title II mandates not only that public entities refrain from intentionally discriminating against disabled individuals but that they also make certain accommodations to the disabled in the course of providing public services, which should include removing architectural barriers in the manner prescribed by 28 C.F.R. § 35.151.

The Court also indicated that Title II targets more than intentional discrimination in *Olmstead v. L.C.*, 527 U.S. 581 (1999). Although it did not fully define the bounds of discrimination under the ADA, the Court stated that Congress advanced "a more comprehensive view of the concept of discrimination" in Title II than one limited to the traditionally recognized categories of intentional and disparate impact discrimination. *Id.* at 598. Together, these cases strongly intimate that Title II, as opposed to Title VI, concerns more than intentional discrimination. In fact, by citing 28 C.F.R. § 35.151 in *Lane* as an exemplar of the type of requirements Title II imposes, the Court suggested that it is precisely the type of regulation that effectuates the mandates of Title II, which in turn suggests that the regulation is enforceable through Title II's private cause of action.

In ascertaining whether 28 C.F.R. § 35.151 effectuates the mandates of Title II, it also is helpful to consider the scope of the Rehabilitation Act, because the ADA and the Rehabilitation Act "are quite similar in purpose and scope." *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997); *see also* H.R. Rep. No. 101-485, pt. 2, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 (stating that § 202 "extends the nondiscrimination policy in section 504 of the Rehabilitation Act of 1973 to cover all State and local governmental entities"). Indeed, the language of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, is nearly identical to that of § 202. *Compare* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."), *with* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). In light of these similarities, we have held that "[t]he analysis of claims under the [ADA] roughly parallels those brought under the Rehabilitation Act." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). As a result, "cases construing one statute are instructive in construing the other." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997); *see also Rogers v. Dep't of Health & Envtl. Control*, 174 F.3d 431, 434 (4th Cir. 1999) ("Relevant Rehabilitation Act precedent . . . may inform our understanding of what [Title II] requires.").

In *Alexander v. Choate*, 469 U.S. 287 (1985), the Supreme Court considered whether private litigants could present a disparate impact claim under § 504 of the Rehabilitation Act to challenge the State of Tennessee's decision to reduce the number of days of inpatient hospital care it covered annually per patient under its state Medicaid program. The Court assumed without deciding that certain disparate impacts are actionable under § 504. 469 U.S. at 299. In making this assumption, the Court noted that the Rehabilitation Act was motivated by Congress's determination that "[d]iscrimination against the handicapped . . . [is] most

often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect." *Id*. at 295. The Court further noted that

> much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent. *For example, elimination of architectural barriers was one of the central aims of the Act, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped.*

*Id*. at 296-97 (emphasis added and citations omitted). What the Rehabilitation Act ultimately requires, the Court determined, was that otherwise qualified disabled individuals "be provided with meaningful access to the benefit that the grantee offers." *Id*. at 301. Because Tennessee's decision to reduce its support for inpatient hospital care did not deprive qualified disabled individuals of meaningful access to Medicaid, however, the Court determined that the decision was not actionable under the Rehabilitation Act. *Id*. at 309.

*Choate* is relevant to our inquiry in two ways. First, because Title II has aims similar to those of the Rehabilitation Act and the two statutes are construed similarly, *Choate* demonstrates that Title II is not simply a prohibition against intentional discrimination. Second, the implication of *Choate* is that Title II prohibits public entities from denying, even unintentionally, qualified disabled individuals meaningful access to the services or benefits they provide. In fact, by noting that the "elimination of architectural barriers was one of the central aims of the Act" even though "such barriers were clearly not erected with the aim or intent of excluding the handicapped," *id.* at 297, it suggests that the conduct at issue here – defendants' failure to provide plaintiffs certain architectural accommodations – is actionable under Title II even when not intentional.

Most importantly, our conclusion is supported by the text of Title II. Title II and the ADA more broadly were motived in part by Congress's finding that, in addition to "outright intentional exclusion," individuals with disabilities also suffer from indirect forms of discrimination, such as "the discriminatory effects of architectural, transportation, and communication barriers, . . . [and] *failure to make modifications to existing facilities*." 42 U.S.C. § 12101(a)(5) (emphasis added). Congress stated that the purpose of the ADA was to eliminate such discrimination, in part by using its power "to enforce the fourteenth amendment and to regulate commerce [] in order to address the major areas of discrimination faced day-to-day by people with disabilities." *Id*. § 12101(b)(1) & (4). Such language shows that Congress, aside from merely hoping to curtail intentional discrimination against the disabled, aimed to improve the quality of the lives of the disabled by requiring that public entities – as well as other entities subject to the Act's requirements – eliminate barriers to physical access, including barriers inherent in existing facilities.

Title II itself carries this mandate. Section 202 reads: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. By separately identifying as requirements of public entities that they not deny qualified disabled individuals the benefits of public services and that they not discriminate against such individuals, the provision demands more of public entities than simply refraining from intentionally discriminating against disabled individuals. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003) ("A plaintiff can prevail [under § 202, 42 U.S.C. 12132] either by showing 'discrimination' or by showing 'deni[al of] the benefits' of public services.") (quoting 42 U.S.C. § 12132); *see also Olmstead*, 527 U.S. at 600 (stating that, with § 202, "Congress not only required all public entities to refrain from discrimination"). In stating that public entities shall not deny qualified disabled individuals the benefits of public services, § 202 necessarily requires that public entities provide such individuals the means necessary to acquire access to these services.

Title II defines "qualified individual with a disability" in this manner:

> The term "qualified individual with a disability" means an individual with a disability who, *with or without* reasonable modifications to rules, policies, or practices, *the removal of architectural*, communication, or transportation *barriers*, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

§ 201, 42 U.S.C. § 12131(2) (emphasis added). Read together with § 202, this definition illustrates that Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled. Section 202 dictates that a qualified individual with a disability may not be denied the benefits of public services by a public entity because of her disability. A person with an ambulatory disability who would be eligible for public services but for publicly imposed architectural impediments to the receipt of such services is a qualified individual with a disability. By virtue of § 202, a public entity could not deny the benefits of the public service to such an individual on account of her disability. However, the architectural barriers do just that. Thus, to ensure that the individual is not denied the benefits of the public service, the public entity must remove the architectural barrier of its own creation. That is, if a disabled individual would be eligible for the receipt of certain public services if architectural barriers were removed, he is a qualified individual with a disability. *See* § 201, 42 U.S.C. § 12131(2). In turn, a public entity may not deny this person the benefits of these public services, *see* § 202, 42 U.S.C. § 12132, which are only being denied to him because of architectural barriers. Hence, to avoid denying the individual of the benefits of the public services at issue, the public entity must remove the impeding architectural barriers. This illustration makes clear that Title II demands that, in certain instances, public entities take affirmative actions to provide qualified disabled individuals with access to public services.

Other portions of Title II make clear that 28 C.F.R. § 35.151 imposes requirements specifically envisioned by the statute. For instance, Title II states that, with respect to regulations that affect program accessibility and existing facilities, "such regulations shall be consistent with regulations and analysis as in [28 C.F.R. § 39.101 *et seq.*], applicable to federally conducted activities under [§ 504 of the Rehabilitation Act]." *See* § 204, 42 U.S.C. § 12134(b). As a regulation falling under Subpart D of part 35 of title 28 of the Code of Federal Regulations, a subpart entitled "Program Accessibility," 28 C.F.R. § 35.151 is by definition a regulation affecting program accessibility. Hence, Title II requires that it be consistent with 28 C.F.R. § 39.101 *et seq.* 28 C.F.R. § 39.101 *et seq.* are regulations ensuring that, in conformance with § 504 of the Rehabilitation Act, the disabled have access to programs and activities conducted by the Department of Justice. Generally, the regulations require the Department of Justice to "operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons." *Id.* § 39.150(a). While this mandate does not "[n]ecessarily require the agency to make each of its existing facilities accessible to and usable by handicapped persons," *id.* § 39.150(a)(1), the clear implication is that it will sometimes be necessary to alter a facility to comply with the regulation.[10] Indeed, "alteration of existing facilities" is one method available under the regulation to achieve compliance with its terms. *Id.* § 39.150(b). When the agency alters an existing building or part of an existing building, the building must be made readily accessible to and usable by disabled individuals, *id.* § 39.151, which echoes 28 C.F.R. § 35.151. By requiring that regulations promulgated in furtherance of its program accessibility objectives be consistent with 28 C.F.R. § 39.101 *et seq.*, Title II necessarily contemplates that such regulations will, akin to 28 C.F.R. § 39.151, require that facilities altered by public entities be made accessible to disabled individuals in the process. As a program accessibility regulation, 28 C.F.R. § 35.151 directly meets this mandate.

---

[10] The regulations define "facility" as including "roads, walks, [and] parking lots." 28 C.F.R. § 39.103.

Elsewhere, Title II indicates that it seeks to impose the very architectural requirements enumerated at § 35.151. Specifically, the statute provides that regulations adopted to effectuate § 202 "*shall include standards applicable to facilities*" and that "[s]uch standards shall be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board in accordance with [42 U.S.C. § 12204(a)]." § 204, 42 U.S.C. § 12134(c) (emphasis added). 42 U.S.C. § 12204(a), in turn, directs the Compliance Board to adopt minimum guidelines that supplement the existing Minimum Guidelines and Requirements for Accessible Design, which are located at 36 C.F.R. §§ 1190.1–.60. The Minimum Guidelines require that altered facilities, which include roads and walks, 36 C.F.R. § 1190.3, shall meet accessibility standards. *See id.* § 1190.33. So that its aims are achieved, Title II mandates that, in addition to these minimum guidelines, the Compliance Board "*shall establish additional requirements . . . to ensure that buildings [and] facilities . . . are accessible, in terms of architecture and design . . . to individuals with disabilities.*" 42 U.S.C. § 12204(b) (emphasis added). By mandating the adoption of the foregoing regulations, Congress intended that Title II serve as a mechanism for imposing affirmative architectural standards on public entities and that meeting such standards would be required of public entities to conform with the dictates of § 202, particularly when public entities alter existing facilities.

The legislative history of Title II supports the notion that 28 C.F.R. § 35.151 effectuates an express mandate of Title II and, hence, should be enforceable by the private cause of action available under Title II. In fact, this history indicates that Congress intended for Title II to require of public entities that they make some of the very accommodations required by 28 C.F.R. § 35.151. For example, the House Report that accompanied the ADA states that, "under [Title II], local and state governments *are required to provide curb cuts on public streets*." H.R. Rep. No. 101-485, pt. 2, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 (emphasis added). The Report continues, "The employment, transportation, and public accommodation sections of this Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." *Id.* Perhaps most instructive is an indication that Congress's intention was that the private cause of action available under Title II extend to the enforcement of its regulations as well, insofar as a violation of a regulation resulted in a denial of access. The Report states that the remedies, rights, and procedures available under § 505 of the Rehabilitation Act, 29 U.S.C. § 794a – which include a private cause of action, *Barnes*, 536 U.S. at 185 – "shall be available with respect to any individual who believes that he or she is being subjected to discrimination on the basis of a disability in violation of any provisions of [Title II], *or regulations promulgated under section 204*, concerning public services." H.R. Rep. No. 101-485, pt. 2, at 98 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 381 (emphasis added). Being one such regulation the violation of which impacts disabled individuals' access to public services, Congress intended that 28 C.F.R. § 35.151 be enforceable through Title II's private cause of action.

Case law as well supports our determinations that Title II reaches beyond prohibiting merely intentional discrimination and that 28 C.F.R. § 35.151 is a regulation that enforces Title II's additional aims. In *Chaffin v. Kansas State Fair Board*, the Tenth Circuit held that – *Sandoval* notwithstanding – the private cause of action under Title II was available to enforce accessibility regulations adopted in furtherance of the Act because the requirements imposed by the regulations fell within the scope of the requirements and prohibitions of Title II. 348 F.3d 850, 857-60 (10th Cir. 2003). The court expressly noted that, "although the conduct regulated by [Title VI] is limited to intentional discrimination, Congress sought with § 504 [of the Rehabilitation Act] – and consequently with Title II of the ADA – to remedy a broad, comprehensive concept of discrimination against individuals with disabilities." *Id.* at 859-60 (citation omitted); *see also Thompson v. Colorado*, 278 F.3d 1020, 1028 (10th Cir. 2001) ("[R]ather than preventing public entities from treating the disabled differently than the nondisabled, Title II requires that public entities make certain accommodations for the disabled in order to ensure their access to government programs."). Excluding the opinion on appeal, three district court opinions have also concluded that ADA regulations are enforceable by Title II's private cause of action because they effectuate the mandates of Title II. *See Nat'l Org. on Disability v. Tartaglione*, No. Civ. A. 01-1923, 2001 WL 1231717, at *6 (E.D. Pa. 2001) (finding that 28 C.F.R. § 35.151 – the provision at issue here – could be enforced through Title II's private cause of action); *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 538-39 (E.D. Pa. 2001) (finding that

private plaintiffs could present claims based on violations of ADA regulations that prohibit disparate impacts and require integrated settings); *Access Living v. Chicago Transit Auth.*, No. 00 C 0770, 2001 WL 492473, at *6 (N.D. Ill. 2001) (finding that discrimination under Title II includes failure to make accommodations for the disabled and that plaintiffs could enforce regulations that clarified this type of discrimination). In *Tartaglione*, the court noted that, with § 204, Congress mandated that regulations be adopted to enforce Title II's prohibition of discrimination and that such regulations should conform with regulations adopted under the Rehabilitation Act, specifically those at 28 C.F.R. § 39.101 *et seq.* 2001 WL 1231717, at *6. Finding that 28 C.F.R. § 35.151 is "virtually identical" to these Rehabilitation Act regulations, the court concluded that Congress intended that § 35.151 be enforceable through Title II's private cause of action. *Tartaglione*, 2001 WL 1231717, at *6.

In conclusion, § 202 of Title II does not merely prohibit intentional discrimination. It also imposes on public entities the requirement that they provide qualified disabled individuals with meaningful access to public services, which in certain instances necessitates that public entities take affirmative steps to remove architectural barriers to such access in the process of altering existing facilities. 28 C.F.R. § 35.151 is a regulation adopted by the Attorney General at Title II's express direction that effectuates this aim. As such, the regulation is enforceable through Title II's private cause of action available under § 203. Therefore, plaintiffs do have a private cause of action against defendants for failing to comply with 28 C.F.R. § 35.151, and we affirm the judgment of the district court on this issue.

**B.**

Plaintiffs argue that the district court erred in failing to find that 28 C.F.R. § 35.150(d) is also enforceable through Title II's private cause of action. They seem to suggest that, since Title II does more than prohibit intentional discrimination, *Sandoval* is wholly inapplicable. This assertion is untenable. Although the differences between Title II of the ADA and Title VI of the Civil Rights Act of 1964 mean that the outcome in *Sandoval* does not necessarily dictate the outcome in this case, the analytical framework provided in *Sandoval* for determining whether a regulation is enforceable through its controlling statute's private cause of action is directly applicable here. As with 28 C.F.R. § 35.151, we must determine whether § 35.150(d) enforces an express mandate of Title II or imposes unique obligations on public entities. If § 35.150(d) imposes obligations not explicitly contemplated by Title II, then it is not enforceable through the Act's private cause of action.

Section 35.150(d)(1) provides that, "[i]n the event that structural changes to facilities will be undertaken to achieve program accessibility, a public entity that employs 50 or more persons shall develop, within six months of January 26, 1992, a transition plan setting forth the steps necessary to complete such changes." The provision specifically requires of a public entity that exercises control over streets that "its transition plan shall include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs." *Id*. § 35.150(d)(2). The district court concluded that, although defendants violated § 35.150(d), it is not enforceable through the private cause of action available under Title II.

The district court did not err. Plaintiffs assert that, like § 35.151, § 35.150(d) imposes obligations necessitated by § 202 and that violations of the regulation are therefore actionable under that provision's private cause of action.[11] While failing to provide curb cuts and other accommodations in the course of altering city streets and sidewalks in violation of § 35.151 denies the disabled meaningful access to public services by perpetuating architectural barriers that impede such access, failing to develop a transition plan in violation of § 35.150(d) does not in and of itself similarly hinder the disabled. Section 35.150(d) may create a procedural requirement that encourages public entities to consider and plan ways in which they will

---

[11]Plaintiffs do not argue that § 204 of Title II, 42 U.S.C. § 12134, which grants the Attorney General the authority to promulgate regulations in furtherance of Title II, independently creates a private cause of action through which § 35.150(d) may be enforced. Therefore, we need not address this issue.

accommodate the disabled, and it may ultimately facilitate compliance with Title II, but there is no indication that a public entity's failure to develop a transition plan harms disabled individuals, let alone in a way that Title II aims to prevent or redress. Indeed, it is conceivable that a public entity could fully satisfy its obligations to accommodate the disabled while at the same time fail to put forth a suitable transition plan.

Bolstering our conclusion is the fact that plaintiffs offer no argument that Title II expressly imposes an obligation on public entities to develop transition plans. Plaintiffs' best potential argument for an implied obligation might be that, by mandating the adoption of program accessibility regulations consistent with Rehabilitation Act regulations found at 28 C.F.R. § 39.101 *et seq.*, *see* 42 U.S.C. § 12134(a)-(b), Title II does contemplate that public entities are required to adopt transition plans. 28 C.F.R. § 39.150(d) does specifically order the Department of Justice to adopt a transition plan before structurally altering a facility under its control to make it accessible to the disabled. The argument would be that, with 42 U.S.C. § 12134, Congress intended to impose the same requirement on public entities through Title II and that 28 C.F.R. § 35.150(d) is the actualization of this intent. Hence, the argument would continue, Title II does obligate public entities to adopt transition plans, albeit indirectly, and § 35.150(d) – which merely effectuates this obligation – is enforceable through its private cause of action.

We do not find this argument persuasive. If we concluded that § 35.150(d) is privately enforceable on the basis that Title II contemplates transition plans because it references Rehabilitation Act regulations, it would follow that all Rehabilitation Act regulations incorporated through Title II would be enforceable through private causes of action, regardless of whether they are even privately enforceable under the Rehabilitation Act and regardless of whether Title II indicated in any other way that it intended to impose the obligation or prohibit the conduct at issue. Perhaps § 35.150(d) would be enforceable through Title II's private cause of action if there were a stronger, more explicit indication from the statute itself that Congress viewed the creation of transition plans as integral to the achievement of the statute's aims or that Congress considered a public entity's failure to adopt such a plan as a form of discrimination against disabled individuals or as a failure to provide them with meaningful access to public services. But there is no indication that Congress conceptualized of transition plans or the failure to adopt them in this manner.

As such, we conclude that § 35.150(d) does more than simply apply or effectuate § 202. Rather, it creates obligations not necessarily required by § 202 and, therefore, it is not enforceable under Title II's private cause of action. *See Sandoval*, 532 U.S. at 285; *see also Deck v. City of Toledo*, 76 F. Supp. 2d 816, 823 (N.D. Ohio 1999) ("[T]here is no private right of action to enforce the self-evaluation and transition plan requirements set forth in the regulations accompanying Title II."); *Matthews v. Jefferson*, 29 F. Supp. 2d 525, 539-40 (W.D. Ark. 1998) (finding that the mere failure to adopt a transition plan in accordance with § 35.150(d) is not independently enforceable).

## III.

For the foregoing reasons, we affirm the district court's grant of partial summary judgment to plaintiffs, its denial of defendants' motion for reconsideration, and its grant of partial summary judgment to defendants.