NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0408n.06

Case No. 24-1954

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 22, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JOHN REINHART, | ) | |
| Plaintiff - Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| CITY OF BIRMINGHAM, MICHIGAN, | ) | |
| Defendant - Appellee. | ) | OPINION |
| | ) | |

Before: COLE, READLER, and RITZ, Circuit Judges.

RITZ, J., delivered the opinion of the court in which COLE and READLER, JJ., concurred. READLER, J. (pp. 9–21), delivered a separate concurring opinion.

**RITZ, Circuit Judge.** John Reinhart claims he is disabled in ways that substantially limit his ability to walk. To ameliorate his condition, he regularly drove to downtown Birmingham, Michigan, to take Pilates exercise classes. He relied on street parking close to the Pilates studio. In 2022, the City of Birmingham eliminated a significant number of those street-parking spaces and replaced them with green space and open seating areas. Reinhart sued the city, alleging a violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and arguing the city failed to keep public facilities readily accessible to disabled individuals, as required under 28 C.F.R. § 35.151(b). He also argued the city intentionally discriminated against him based on his disability. The district court rejected both claims and granted summary judgment to the city. We affirm.

## BACKGROUND

Reinhart is a 77-year-old man with a history of injuries and medical conditions, including surgeries on his back, knee, and hip. These conditions allegedly limit his ability to walk. His difficulty with walking was "at [its] peak" in June 2022, when he underwent a back surgery. CA6 R. 12, Appellant Br., at 5. While Reinhart experienced some improvement after the surgery, he suffered a fall later in the summer of 2022. As a result, he had to use a walker for a period. Even now, he cannot walk for more than a half mile without experiencing pain. Reinhart also testified about severe back pain triggered by sitting in a reclined position.

To mitigate these difficulties and strengthen his body, Reinhart engaged in Pilates exercises. Reinhart regularly drove to downtown Birmingham, Michigan, to access the Pilates studio located at 555 South Old Woodward Avenue ("the 555 Building"). The area surrounding the 555 Building has retail, dining, fitness facilities, and other lifestyle establishments. Given his difficulty with walking long distances, Reinhart relied on street parking close by the 555 Building.

Later in 2022, the city approved a renovation project that, according to Reinhart, did four things to make the 555 Building and the surrounding area less accessible to him. First, the project eliminated fifty to sixty street-parking spaces on South Old Woodward Avenue and replaced them with more green space and open seating areas. This change left about eighty street-parking spots. Second, the city removed one of ten existing handicap street-parking spaces. Third, it eliminated a loading zone close to the 555 Building. The loading zone was used by people with disabilities because the closest parking deck was inaccessible for handicap-accessible vans due to height restrictions. And fourth, the project allegedly relocated the handicap parking spaces to areas farther away from building entrances.

Prior to implementing these changes, the city held public hearings in which residents and business owners raised concerns about the project's reduction of street-parking spaces. During those hearings, city officials made comments that Reinhart claims were dismissive of those concerns. For example, a city commissioner stated that the primary goal of the project was to change "the feel[] and the look[]" of South Old Woodward Avenue and that, to accomplish this goal, parking had to be reduced and people were "going to have to walk twice as far." Additionally, the city's mayor *pro tem* stated at a public meeting: "This is not at all a rushed decision. . . . This is not a mistake. . . . Your patrons will get used to it. They're healthy. . . . They look for wellness. I hope they like to walk."

Meanwhile, demand for parking in the area has allegedly increased. Even though it reduced the number of available street-parking spaces, the city also approved a special land-use permit for the development of a four-story retail and dining facility. The permit allowed for the addition of only twenty-four parking spaces, even though the city's zoning ordinance supposedly requires more for a building of that size.

In May 2022, Reinhart filed a federal complaint against the city, asserting a violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*. Specifically, he alleged the city failed to keep public facilities readily accessible to disabled individuals, as required under 28 C.F.R. § 35.151(b). He also alleged the city intentionally discriminated against him based on his disability. The district court granted the city's motion for summary judgment, and Reinhart appealed.

**ANALYSIS**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

3

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Local governments, like the City of Birmingham, are public entities. *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 (6th Cir. 2004) (citing 42 U.S.C. § 12131(1)(A), (B)).

To make out a case under Title II of the ADA, a plaintiff must establish three elements: "(1) he has a qualifying disability, (2) he is otherwise qualified for a program, and (3) he was excluded from participation in, denied the benefits of, or subjected to discrimination under a program because of his disability." *Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024) (citing *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008)). The district court granted the city's summary-judgment motion, holding that Reinhart failed to establish the first and third elements: that is, Reinhart was not disabled, nor was he subjected to any disability-based discrimination by the city. We review the grant of summary judgment de novo. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (citing *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020)).

Reinhart advances two arguments to prove the discrimination element: failure to comply with 28 C.F.R. § 35.151 and intentional discrimination by the city. We reject both arguments. And because that determination is dispositive of this appeal, we need not decide whether Reinhart is disabled under the ADA. *See Jones v. City of Monroe*, 341 F.3d 474, 477 n.4 (6th Cir. 2003) (assuming plaintiff met first two elements of prima facie case and dismissing claim based on third element), *abrogated in part on other grounds by*, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc). Also, because Reinhart's § 35.151 claim fails on the merits, we likewise need not address the parties' arguments about whether this claim was forfeited.

24-1954, *Reinhart v. City of Birmingham, Mich.*

## I.      28 C.F.R. § 35.151

"As authorized by the statute, 42 U.S.C. § 12134, the United States Attorney General has promulgated a vast body of regulations implementing Title II." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014); *see also Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998). Reinhart brings his ADA claim under one of those regulations: 28 C.F.R. § 35.151(b). He has the right to bring a private cause of action to enforce this regulation. *Ability Ctr.*, 385 F.3d at 907.

As with any ADA claim, it is important to define the "benefits of the services, programs, or activities of a public entity," 42 U.S.C. § 12132, which the disabled individual claims he was denied. *See Jones*, 341 F.3d at 477-78 (citing *Alexander v. Choate*, 469 U.S. 287, 303 (1985)). The text of § 35.151 "flesh[es] out [the city's] statutory obligations with more specificity." *Cohen*, 754 F.3d at 695; *see also Owens v. O'Dea*, 149 F.3d 1184, 1998 WL 344063, at *3 (6th Cir. 1998) (table) ("The language applicable to public services, benefits, and programs is found in the regulations implementing Title II."). That section provides that when a public entity alters a facility "in a manner that affects or could affect the usability of the facility," the facility "shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities," 28 C.F.R. § 35.151(b)(1), unless doing so would be "structurally impracticable." *Id.* § 35.151(a)(2); *see also Ability Ctr.*, 385 F.3d at 904.

Here, Reinhart argues that the "facility" altered by the city—i.e., the public benefits subject to our inquiry under § 35.151(b)(1)—is the street-parking area on South Old Woodward Avenue.[1]

---

[1]  Though Reinhart alleges alterations of other facilities, such as removal of the loading dock in front of the 555 Building and relocation of handicap parking spots to farther away from the

5

Namely, the city reduced the number of available street-parking spots and replaced them with green space and open seating areas. The city also removed one of ten existing handicap street-parking spots in the area. Reinhart argues that, by implementing these changes, the city violated § 35.151(b) because street parking is no longer "readily accessible to and usable by" him. 28 C.F.R. § 35.151(b)(1). He testified that there was often no available street-parking space close by the 555 Building when he drove there for his Pilates lessons.

As an initial matter, we assume that the meaning of "facility" covers public street parking. The definition of "facility" expressly includes "parking lots," 28 C.F.R. § 35.104, and the city does not dispute that street parking fits within this definition. Furthermore, we have said "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson*, 151 F.3d at 569.

Regardless, Reinhart's argument fails. To prevail under Title II of the ADA, a plaintiff must establish a causal connection between the alleged denial of public benefits and the plaintiff's disability. *Finley*, 102 F.4th at 820 (citing *S.S.*, 532 F.3d at 453); *see also* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, *by reason of such disability*, . . . be denied the benefits of the services, programs, or activities of a public entity . . . ." (emphasis added)). Yet, Reinhart makes no argument that he was denied readily accessible street parking on South Old Woodward Avenue due to his disability. Instead, he argues, and in turn concedes, that any

---

building entrances, Reinhart did not base his § 35.151 claim on those facts in his summary-judgment brief. As a result, the district court did not analyze Reinhart's § 35.151 based on those facts. Even on appeal, Reinhart focuses his § 35.151 claim on the general reduction of street-parking spaces and the elimination of one handicap parking spot. To the extent Reinhart argues that the additional alterations also violate § 35.151, we deem that argument forfeited. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) ("Where issues are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, we consider them forfeited." (cleaned up) (citation omitted)).

accessibility issue is due to the overall reduction of the parking spots combined with an increase in demand for parking. To the extent there is a parking shortage as a result of the city's actions, that is an issue faced by both disabled and non-disabled individuals. *See Jones*, 341 F.3d at 478 (denying ADA claim where "[t]he parking limitations d[id] not affect disabled and nondisabled individuals differently in any respect").

Reinhart also argues that, due to the reduction of street-parking spaces, he cannot readily access the 555 Building where he takes his Pilates lessons. Such framing conflates accessibility of the street-parking spaces with accessibility of the 555 Building. Section 35.151(b)'s text concerns the former, demanding only that "the facility" the city has "altered" remain "readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b)(1). Put differently, the regulation does not impose on the city an obligation to ensure that Reinhart can access a specific private building that was not part of the city's alterations. Accordingly, we reject his § 35.151 claim.

## II. Intentional discrimination

We next turn to Reinhart's intentional-discrimination claim. To establish intentional discrimination under Title II of the ADA, "the plaintiff must show that the defendant took action because of the plaintiff's disability." *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). Specifically, "the '[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* (alteration in original) (quoting *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006)). So here, Reinhart

must show that the city reduced the street-parking spaces on South Old Woodward Avenue *because of* its discriminatory animus toward disabled individuals like Reinhart.

Reinhart fails to meet that standard. Reinhart relies on certain statements by city officials at public hearings concerning the reduction of street-parking spaces, including statements that the public should "get used to" walking farther because the officials themselves "ha[d] no problem doing it." CA6 R. 12, Appellant Br., at 39. But such evidence at most demonstrates that the city was dismissive of the public's concerns. It does not show that discriminatory animus toward disabled individuals motivated the city's decision to reduce the street-parking spaces. *See Anderson*, 798 F.3d at 357-58.

Reinhart also points to the elimination of the loading zone, the relocation of handicap parking spaces to "farther away from [building] entrances," and the installation of certain notices for the handicapped in "remote, ineffective locations." CA6, R. 20, Reply Br., at 13. According to him, these actions demonstrate the city's intentional discrimination toward people with disabilities. But actions that have a negative impact on disabled individuals do not by themselves prove discriminatory intent. *See Anderson*, 798 F.3d at 359 ("Even if the City's procedures for compliance with federal regulations had a negative impact on its disabled citizens generally, this does not support the inference that the City's actions were motivated by [plaintiff's] disability."). Reinhart needed to show that the city took those actions "because of" its animus toward disabled individuals. *Id.* at 357. He failed to present any such evidence. Accordingly, we reject his intentional-discrimination claim.

## CONCLUSION

For these reasons, we affirm the district court's order granting summary judgment to the city.

8

READLER, Circuit Judge, concurring. John Reinhart believes that the City of Birmingham violated Title II of the Americans with Disabilities Act by eliminating roughly 60 on-street parking spaces (including one accessible space) in the city's downtown. In his complaint, Reinhart asserted two claims—one, that Birmingham intentionally discriminated against him in violation of Title II, 42 U.S.C. § 12132, and two, that the city violated a regulation promulgated under Title II by the Attorney General, 28 C.F.R. § 35.151(b)(1). I agree with the majority opinion's thoughtful conclusion that both claims fail on the merits.

I write separately because I doubt that Title II, read with fresh eyes, allows Reinhart to bring his second claim. On that front, Reinhart is seeking to enforce a Department of Justice regulation that requires public entities, when altering a "facility," to make the alterations to "the maximum extent feasible" in a manner that is "readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b)(1). As the majority opinion recognizes, a precedent of ours authorizes a private cause of action to enforce the regulation. Specifically, *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901 (6th Cir. 2004), held that § 35.151(b)(1) is "enforceable through" the "private cause of action" created by Title II of the ADA because it enforces the statute's mandate that "public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide." *Id.* at 907. That conclusion, in my view, is debatable.

A. A few bookend principles frame the analysis. When a plaintiff seeks to enforce in federal court a private right that federal law affords him, a cause of action must exist to enforce that right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002). Congress, not the judiciary, creates both the substantive right and the private right of action. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Because right and remedy necessarily go hand in hand, a plaintiff cannot use a

9

statute's cause of action to bring a claim tied to conduct that is "not prohibited" by the text of the statute. *Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*, 511 U.S. 164, 173 (1994).

Take Title VI of the Civil Rights Act of 1964 as an example. Section 601 of the statute provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" receiving federal funds, 42 U.S.C. § 2000d, a provision that has been understood to create a private right against intentional discrimination, *Sandoval*, 532 U.S. at 286. Congress has likewise authorized private individuals to sue to enforce § 601. *Id*. at 280 (citing 42 U.S.C. § 2000d-7). Recognizing the scope of the relevant right and remedy, *Sandoval* held that a private party may sue to enforce § 601's ban on intentional discrimination and any regulations applying § 601's prohibition. *Id.* at 284. Yet at the same time, *Sandoval* made clear that a plaintiff cannot rely on the private right of action to sue for acts that § 601 does not prohibit. For example, a plaintiff cannot rely on Title VI's private remedy to enforce regulations seeking to prohibit activities that unintentionally have a disparate impact on racial groups. *Id.* at 285.

B. Turn then to the scope of the right and private remedy at issue in this appeal. First the right. Section 202 of Title II provides that individuals with disabilities shall not, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This section, like § 601 of Title VI, includes a right against intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 184 (2002) (describing § 202 as "prohibit[ing] discrimination against the disabled by public entities"); *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020). And next door to § 202, Congress set forth a private remedy to enforce the right:

10

Section 203 makes the remedies for violations of § 202 "coextensive" with those for Title VI. *Barnes*, 536 U.S. at 184 (citing 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2)). The upshot of all this? Similar to Title VI, private plaintiffs (like Reinhart) invoking Title II can, at the very least, sue to enforce claims of intentional discrimination. And, to reiterate, I agree with the majority opinion that Reinhart's intentional discrimination claim easily fails.

Yet there is more to Reinhart's complaint. In addition to Title II's ban on intentional discrimination, he also seeks to enforce a regulation, 28 C.F.R. § 35.151(b)(1). In doing so, he relies on our decision in *Ability Center*, which, again, held that the regulation is enforceable through Title II's cause of action. 385 F.3d at 913. Were we starting from first principles, one could fairly wonder whether Title II's private cause of action to remedy violations of § 202 authorizes enforcement of § 35.151(b)(1). After all, nothing in § 35.151(b)(1) imposes obligations on local governments related to intentional discrimination. The regulation, again, tells local governments that if they alter a facility in a manner that affects or could affect its usability, the altered portion of the facility (to the maximum extent feasible) must be readily accessible to and usable by persons with disabilities. 28 C.F.R. § 35.151(b)(1). But failing to make an altered facility readily accessible to and usable by disabled people is not an intentionally discriminatory act.

*Ability Center* conceded as much. Yet it understood § 202 to do "more than prohibit public entities from intentionally discriminating against disabled individuals." 385 F.3d at 907. Rather, it read the private right at issue also to "require[] that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide." *Id.* Title II's text and context, as well as background constitutional principles all belie such a reading.

11

By all accounts, the statute protects against intentional discrimination, and nothing more. Start with the words Congress chose in § 202. It contains two clauses concerning a public entity's treatment of qualified individuals with a disability. First, such individuals shall not, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Second, public entities may not "subject[]" those individuals to "discrimination." *Id.*; *see also Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013) (recognizing that the circuit courts "have helpfully divided § 12132 into two clauses for purposes of analysis").

Nothing in the text of § 202 imposes liability based on a public entity's mere refusal to modify its facially neutral services, programs, or activities. As reflected in the first clause, a public entity violates that section only when it denies such benefits or excludes the disabled from those benefits "by reason of . . . disability." 42 U.S.C. § 12132. Liability, in other words, hinges on the "explanation or justification" for the public entity's actions. *See Black's Law Dictionary* (12th ed. 2024) (defining "reason" as "[a]n expression or statement given by way of explanation or justification; whatever is supposed or affirmed to support a conclusion, inference, or plan of action"); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (interpreting synonymous phrasing in the Age Discrimination in Employment Act to require the protected characteristic to be the "reason" the defendant "decided to act"). Any other understanding of the phrase "by reason of"—say, for instance, simple causation, *see A. J. T. ex rel. A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 145 S. Ct. 1647, 1662 (2025) (Sotomayor, J., concurring)—would make that phrase superfluous, as the remaining text of § 202 already prohibits individuals with disabilities from being "excluded from participation in or . . . denied the benefits of" a public entity's "services, programs, or activities." *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S.

12

202, 209 (1997) ("Statutes must be interpreted, if possible, to give each word some operative effect.").

Section 202's discrimination clause likewise requires a showing of intentional discrimination, serving as a catchall prohibiting any discriminatory acts that are not barred by the first clause. *See Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020) (acknowledging Congress may employ a "belt and suspenders" approach to ensure its aims are met). Its phrasing is identical to Title VI's discrimination clause, which, as discussed, "prohibits only intentional discrimination." *Sandoval*, 532 U.S. at 280. And as Title II explicitly incorporated Title VI via the Rehabilitation Act, *see Barnes*, 536 U.S. at 185, "Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *see also United States v. Florida*, 511 U.S. 164, 1228 (11th Cir. 2019) (concluding that prior interpretations of Title VI necessarily inform what Title II means). Such a reading also aligns with the plain meaning of the word "discrimination," which ordinarily "requires a showing that a claimant received differential treatment vis-à-vis members of a different group on the basis of a statutorily described characteristic." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 (1999) (Thomas, J., dissenting); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (understanding "discrimination" to be synonymous with differential treatment); *The New Oxford American Dictionary* 488 (1st ed. 2001) (understanding "discriminate" to require an "unjust or prejudicial distinction in the treatment of" an individual on the grounds of a protected class).

The ADA's structure confirms the understanding that § 202 protects against intentional discrimination only. The ADA forbids disability discrimination in other settings beyond Title II's focus on public services. For instance, Title I of the Act forbids disability discrimination in

employment, 42 U.S.C. § 12112, while Title III focuses on eradicating discrimination in places of public accommodations, *id.* § 12182, like hotels, restaurants, or movie theaters, *id.* § 12181(7). Notably, both Title I and Title III expressly define discrimination as going beyond intentional acts, to include "not making reasonable accommodations." *Id.* § 12112(b)(5)(A) (Title I); *id.* § 12182(b)(2)(A)(ii) (Title III). Title II, by comparison, does "not expressly define 'discrimination.'" *See Madej*, 951 F.3d at 372. That difference bears emphasis. After all, when Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation modified). In this setting, the necessary conclusion is that Title II's understanding of discrimination departs from its counterparts, incorporating the ordinary understanding that discrimination aligns with an intent to discriminate. *See Olmstead*, 572 U.S. at 622–23.

Even if there were doubts about § 202's scope, background principles of constitutional law require clear language from Congress before we allow states and localities to be sued over acts that inadvertently affect the disabled. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (recognizing the "lack of clear language in the statute" allowing for reasonable accommodation claims). Recall that Title II concerns the "services, programs, or activities" of any "public entity," 42 U.S.C. § 12132, which, in turn, means "any department, agency, special purpose district, or other instrumentality of a State or States," *id.* § 12131. Eliminating any intent requirement from § 202, as one amicus to the Supreme Court recently remarked, "would eviscerate state authority in areas of traditional state regulation." Brief for State of Tennessee et al. as Amici Curiae Supporting Respondents at 14, *A. J. T.*, 145 S. Ct. 1647 (2025) (No. 24-249). State and local "services, programs, or activities," it bears emphasizing, run the gamut of governmental

14

activity, from prison facilities and emergency response services to playgrounds and hospital services. *Id.* at 14–15; *see also* Maj. Op. at 6 (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998)). So we normally require "exceedingly clear language" from Congress before understanding a federal statute to intrude on the day-to-day operations of state and local governments. *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–51 (2020). Doubly so when Congress's means of enforcement is by abrogating state sovereign immunity through § 5 of the Fourteenth Amendment. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000); *see also Tennessee v. Lane*, 541 U.S. 509, 522 (2004) (recognizing § 5 as a basis for Title II). (Congress also attempted abrogation through the commerce power, 42 U.S.C. § 12101(b)(4), but precedent forecloses that route, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 63, 72 (1996).) Indeed, reading § 202 in a contrary manner to affirmatively impose reasonable accommodation obligations on the states would seem to exceed Congress's authority to enforce the Fourteenth Amendment. *See Coleman v. Ct. of Appeals*, 566 U.S. 30, 45 (2012) (Scalia, J., concurring). That constitutional provision, remember, prohibits only conduct against the disabled that lacks a rational relationship to a legitimate governmental purpose, such as decisions motivated by a "bare . . . desire to harm." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (citation modified); *see Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (holding the Fourteenth Amendment does "not requir[e]" schools to "make special accommodations for the disabled"); *see also Lane*, 541 U.S. at 531 (upholding Title II as valid § 5 legislation only as it applies to "the class of cases implicating the accessibility of judicial services"). In light of this plausible, indeed persuasive, alternative understanding of § 202 to reach only intentional discrimination, *Ability Center*'s more expansive reading of Title II should have been avoided. *See Jennings v. Rodriguez*, 138 S. Ct. 281, 286 (2018).

15

All told, were we operating on a clean slate, I would treat private claims seeking to enforce § 202 in line with how we consider claims enforcing Title VI through a private remedy under *Sandoval*. Namely, § 202 is concerned only with intentional discrimination, so Reinhart, by seeking to enforce a regulation centered on conduct that is "not prohibited" by § 202, cannot use § 203's private remedy to enforce 28 C.F.R. § 35.151(b)(1). *Cent. Bank of Denv.*, 511 U.S. at 173; *Sandoval*, 532 U.S. at 280. And if Title II's cause of action does not permit Reinhart to enforce § 35.151(b)(1), Reinhart lacks a path to bring a claim based on the regulation. To be sure, § 35.151(b)(1) was promulgated under the Attorney General's authority to enact regulations that "implement" Title II. *See* 42 U.S.C. § 12134(a). But even assuming the regulation validly "implements" Title II, to have a private right to enforce § 35.151(b)(1) requires that Congress intended "to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. Section 204 comes up short from the start. It does not create any rights at all, but instead merely delegates rulemaking authority to the Attorney General. 42 U.S.C. § 1234. Given its narrow calling, § 204, not surprisingly, "focuses neither on the individuals protected nor even on the funding recipients being regulated." *Sandoval*, 532 U.S. at 289. Because § 204 merely directs the Attorney General to "do . . . regulating," I am hesitant to read into the provision a "private remedy in favor of individual persons." *Id.* (citation modified).

C. With all signs pointing to the conclusion that § 202 does not go beyond prohibiting public entities from intentionally discriminating against disabled individuals (and, in turn, that plaintiffs lack any private right of action to enforce 28 C.F.R. § 35.151(b)(1)), where did *Ability Center* go wrong? To begin, it eschewed the usual rule of starting with § 202's text. *See Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1218 (2023) ("As always, we start with the text [of the statute]."). What did the opinion look to instead? Two cases—*Tennessee v. Lane* and *Olmstead v. L.C. ex rel.*

*Zimring*—that we understood to "strongly intimate that Title II, as opposed to Title VI, concerns more than intentional discrimination." *Ability Ctr.*, 385 F.3d at 908. But we are bound by the Supreme Court's holdings and reasoning, not its vibes. *See Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 721 (6th Cir. 2016). And by that measure, neither case is all that helpful. True, *Lane*, en route to upholding a specific application of Title II as a valid exercise of Congress's § 5 powers, cited Title II's definitions provision for the proposition that the statute requires reasonable accommodations. *See Lane*, 541 U.S. at 531. But all parties there assumed as much. *See* Brief for Respondents at 43–44 n.8, *A. J. T.*, 145 S. Ct. 1647 (2025) (No. 24-249). Critically, *Lane* never analyzed § 202's text in arriving at its narrow holding about Congress's authority to legislate to effectuate court access. *Olmstead* was equally focused, holding that Title II's "proscription of discrimination" encompasses the unwarranted institutionalization of disabled individuals—namely, where the state persists in institutionalizing a disabled individual over the objections of the individual and the state's treatment professionals. 527 U.S. at 600 (majority opinion); *see also Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 468 (6th Cir. 2020) (Readler, J., concurring in part and dissenting in part) (noting limited reach of *Olmstead*). Notably, *Olmstead* expressly reserved the issue of whether § 202 authorized reasonable accommodation regulations. 527 U.S. at 592 ("We recite these regulations with the caveat that we do not here determine their validity."). In short, nothing in either case engaged the question of whether § 202 targets "more than intentional discrimination," let alone held as much. *Ability Ctr.*, 385 F.3d at 908.

Next, *Ability Center* turned to case law interpreting § 202's "nearly identical" analog in § 504 of the Rehabilitation Act of 1973, 385 F.3d at 908–09. That statute provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of

her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Turning from text to purported precedent, *Ability Center* relied on dicta from *Alexander v. Choate*, 469 U.S. 287 (1985), that spoke favorably about disparate impact liability en route to "assum[ing] without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped." *Id.* at 299. That reliance did not age well. We have since resolved what "*Choate* did not" and "conclude[d] that § 504 does not prohibit disparate-impact discrimination." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019) (recognizing the Rehabilitation Act's bar on discrimination "solely by reason of her or his disability" does not encompass actions taken for nondiscriminatory reasons). And as § 504 and § 202 "appl[y] the same prohibition" against discrimination, if the former does not include an intent requirement, neither should the latter. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 159 (2017).

Several pages into its analysis, *Ability Center* finally arrived at Title II's text. 385 F.3d at 909. Yet it largely ignored what it found. Instead of interpreting key terms like "by reason of" or "discrimination," we turned elsewhere. For instance, we looked to the general findings of the ADA. *Id.* (citing 42 U.S.C. § 12101). Yet those general statements of purpose encompass all of the ADA's titles, including those that expressly included reasonable accommodation provisions. Equally problematic, "even the most formidable argument concerning [a] statute's purposes" cannot be used to "overcome the clarity [found] in the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211–12 (1998) (holding that the ADA's "statement of findings and purpose" and title "cannot limit the plain meaning of the text" (quoting *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947)).

We also considered Title II's definition of "qualified individual with a disability." 385 F.3d at 909. But that definition, which by its terms considers someone disabled regardless of whether they been provided a "reasonable modification," does not purport to define the scope of liability under § 202, let alone in an exceedingly clear manner. 42 U.S.C. § 12131(2); *Cowpasture River Pres. Ass'n*, 140 S. Ct. at 1849–51. In fact, Title II's definition mirrors Title I's. *Compare* 42 U.S.C. § 12131(2), *with id.* § 12111(8). Yet Title I expressly includes reasonable accommodation claims, which would seem unnecessary if the ADA's definition sections were driving the train. *Russello*, 464 U.S. at 23. Finally, *Ability Center*'s brief engagement with Title II's text turned to § 204, which, recall, authorizes the Department of Justice to enact regulations to implement Title II. But, again, § 204 creates no private rights or remedies. *See Sandoval*, 532 U.S. at 286. Instead, the focus should have been on § 202, as Title II's private remedy extends to enforce that section only. *See* 42 U.S.C. § 12133.

(An additional text-based argument that *Ability Center* did not and could not have made when it was issued is worth consideration. In 2008, Congress amended § 501 of the ADA to clarify that a host of entities regulated under all three Titles of the statute, including "a public entity under [Title] II," did not have to provide reasonable accommodations to a particular set of individuals. 42 U.S.C. § 12201(h). Some have drawn from this legislative development the implication that § 202 lacks any intent requirement. *See A.J.T.*, 145 S. Ct. at 1662–63 (Sotomayor, J., concurring). But nothing in that provision purports to amend § 202, let alone add any clear language as to § 202's scope. *See Dellmuth v. Muth*, 491 U.S. 223, 230 (1989) ("[E]vidence of congressional intent [to abrogate state sovereign immunity] must be both unequivocal and textual."); *see also United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 343 (6th Cir. 2000) (citation modified) (requiring a "clearly expressed purpose" in the text of the statute to "work a repeal or amendment

19

by implication"); *Sandoval*, 532 U.S. at 292 (citation modified) (refusing to infer congressional ratification of lower court decisions from an isolated amendment). A plausible alternative is that the provision merely recognizes an exception to any reasonable accommodation claim that possibly exists or acknowledges the validity of DOJ reasonable accommodation regulations adopted under § 204. All said, § 501(h) is a strange place for Congress to massively expand state and local exposure to private lawsuits under Title II.)

*Ability Center*'s final refuges do not make the opinion any more persuasive. First, we turned to Title II's legislative history, picking out a few quotes from a House report in support of our preferred reading. 385 F.3d at 911–12. But "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). And it is massively disfavored in modern jurisprudence. *See United States v. Hensley*, 110 F.4th 900, 905 (6th Cir. 2024) ("The use of legislative history has been all but discontinued."); *see also* John F. Manning, *The New Purposivism*, 2011 Sup. Ct. Rev. 113, 114–15 (2012) (recognizing the downfall of legislative history as an interpretive tool). Second, we recognized that other courts had deemed Title II's private cause of action to extend to regulations that "enforce[] Title II's additional aims" beyond intentional discrimination. 385 F.3d at 912. But none of the cited cases meaningfully engaged with § 202's text. *See, e.g.*, *Chafflin v. Kan. State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003), *overruled on other grounds by*, *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635 (2002), *as recognized by*, *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159 (10th Cir. 2012); *Nat'l Org. on Disability v. Tartaglione*, No. 01-1923, 2001 WL 1231717, at *6–7 (E.D. Pa. Oct. 11, 2001); *Access Living of Metro. Chi. v. Chi. Transit Auth.*, No. 00 C 0770, 2001 WL 492473, at *6 (N.D. Ill. May 9, 2001).

Nonetheless, the point deserves consideration. Reasonable accommodation liability is the prevailing standard among the circuit courts. *See, e.g.*, *Sosa v. Mass. Dep't of Corr.*, 80 F.4th 15,

20

30 (1st Cir. 2023) (collecting cases). But just because we have done something before does not mean we should do it again. *See* Charles Dickens, *A Tale of Two Cities* 65 (Signet Classics) (1859) ("'Whatever is is right'; an aphorism that would be as final as it is lazy, did it not include the troublesome consequence, that nothing that ever was, was wrong."). Especially so when it comes to a "widely utilized federal statute" with profound effects on how every state and locality operates. *A. J. T.*, 145 S. Ct. at 1660–61 (Thomas, J., concurring, joined by Kavanaugh, J.) (acknowledging that the intent-only view of Title II "may have a point" and inviting the Supreme Court's reconsideration of the "existing standard" governing disability law). Indeed, many of the cases that served as the starting point for reasonable accommodation liability in our sister circuits erred in the same ways *Ability Center* did. *See, e.g.*, *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846–48 (7th Cir. 1999) (focusing on legislative history and dicta from *Choate*); *see also id.* at 847 (collecting cases from other circuits employing the same reasoning).

All things considered, I am skeptical of our holding in *Ability Center* that a plaintiff may enforce 28 C.F.R. § 35.151(b)(1) by reliance on Title II's cause of action and, further, that § 202 extends beyond intentional discrimination. I look forward to a future court reconsidering these matters.